**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO.**

**EDWIN GARRISON**, *et al.,* on behalf of
themselves and all others similarly situated,

    *Plaintiffs,*

    *v.*

**SULLIVAN & CROMWELL, LLP.**

    *Defendant.*

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*The difference between something that's illegal and something that needs your advice and counsel to get corrected is usually pretty stark.*

*Your job is to not miss the former and mistake it for the latter.*

*—Ryne Miller, announcing his new firm (Miller Strategic Partners) in 2023.*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

I.   PARTIES ...............................................................................................................14

II.   JURISDICTION & VENUE ................................................................................17

III.  FACTUAL ALLEGATIONS.................................................................................18

    A.   The Rise of FTX ...........................................................................................18

    B.   FTX's Key Insider Players ..........................................................................21

        (1)  Sam Bankman-Fried .............................................................................21

        (2)  Caroline Ellison ...................................................................................22

        (3)  Gary Wang ............................................................................................23

        (4)  Nishad Singh ........................................................................................23

    C.   The Basics of a Cryptocurrency Exchange ................................................25

    D.   The Mechanics of the FTX Fraudulent Scheme.........................................26

    E.   The FTX Fraud's Collapse ..........................................................................31

    F.   FTX Files for Bankruptcy ...........................................................................34

    G.   Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct ...........................37

    H.   S&C's Role in the FTX Fraud......................................................................39

        a.   S&C Forms a Close Relationship with FTX via Ryne Miller. ...........................39

        b.   S&C's Involvement in FTX and Alameda Research ............................................40

          i. The LedgerX Acquisition .............................................................. 40

          ii.  The Voyager Asset Purchase and Other Pre-Petition Bankruptcy Matters......... 42

          iii. Counsel to Emergent, One of the FTX Group's Primary Laundering Vehicles . 43

          iv. LedgerX's CFTC Application................................................................. 44

          v.  Legal Services to FTX Insiders .............................................................. 47

          vi. Miscellaneous Other Matters ................................................................ 50

          vii. The FTX Group's Bankruptcy Petition and Administration .............................. 50

        c.   S&C's Knowledge of & Assistance in FTX's Wrongdoing. ................................. 51

IV.  CLASS ACTION ALLEGATIONS................................................................55

      A.   Class Definitions ................................................................................ 55

i

(1) International Class ........................................................................... 56

(2) Nationwide Class ........................................................................... 56

B.   Numerosity .................................................................................. 56

C.   Commonality/Predominance ........................................................ 56

D.   Typicality ................................................................................... 57

E.   Adequacy of Representation ........................................................ 57

F.   Requirements of Fed. R. Civ. P. 23(b)(3) ................................... 58

G.   Superiority .................................................................................. 58

H.   Requirements of Fed. R. Civ. P. 23(b)(2) ................................... 59

I.   Requirements of Fed. R. Civ. P. 23(c)(4) .................................... 59

J.   Nature of Notice to the Proposed Class. ..................................... 59

V.   CAUSES OF ACTION .........................................................................60

COUNT 1 ......................................................................................... 60

Civil Conspiracy ............................................................................. 60

COUNT 2 ......................................................................................... 61

Common Law Aiding and Abetting Fraud ...................................... 61

COUNT 3 ......................................................................................... 64

Common Law Aiding and Abetting Fiduciary Breach, FTX US ................ 64

COUNT 4 ......................................................................................... 66

Common Law Aiding and Abetting Fiduciary Breach, FTX Trading Ltd. .. 66

COUNT 5 ......................................................................................... 67

Federal R.I.C.O., 18 U.S.C. § 1962(d) ......................................... 67

PRAYER FOR RELIEF .........................................................................71

DEMAND FOR JURY TRIAL .............................................................71

Plaintiffs hereby sue Sullivan and Cromwell, LLP ("S&C") for actively participating in the FTX Group's multibillion dollar fraud.[1]

## **INTRODUCTION**

1.      There can be no dispute that S&C is one of the foremost and most profitable American multinational law firms in the world. Founded in 1879 by Algernon Sydney Sullivan and William Nelson Cromwell, S&C advised J.P. Morgan during the creation of Edison General Electric (1882) and later guided key players in the formation of U.S. Steel (1901).

2.      Almost every industry fell victim to the greed and avarice evoked by the world of crypto; the legal profession, unfortunately, was no exception. Law firms, such as Fenwick, & West, have already been named as Defendants in the FTX MDL, along with accountants, banks, professionals, promoters, and FTX insiders.[2]

3.      According to the *Financial Times*:

> When crypto started breaking into the mainstream, Sullivan was divided along generational lines, according to a former employee. The firm, which has 900 attorneys overall and is headquartered in Manhattan's financial district, even banned its lawyers from owning crypto. It was cautious at first, but then blue-chip start-ups came calling, including the likes of Coinbase, DCG, Galaxy and Gemini, as well as FTX, which needed advice as they began to interact with financial regulators and counterparties.

---

[1] This Action is brought after a year of FTX Multi-District Litigation ("MDL"), where counsel have uncovered *some* of the relevant discovery, based in part, on settlement discussions with various FTX Insiders. Further discovery will be necessary to resolve many of these factual disputes. To date, the FTX Receiver has not agreed to share any of the FTX Receivership materials (including S&C materials) with MDL Leadership. One of the main reasons the FTX fraud was able to grow to unprecedented levels, was the top-secret relationship between FTX and Alameda Research and thus responsive discovery on those issues will be necessary. Plaintiffs will immediately seek transfer of this action to the ongoing MDL pending in the Southern District of Florida, No. 23-md-03076-KMM, (the "MDL Court") per 28 U.S.C. § 1407.

[2] Similarly, the law firm McCarter & English also faces allegations stemming from its involvement with Voyager Digital Ltd., another cryptocurrency platform that collapsed and filed for Chapter 11 bankruptcy https://news.bloomberglaw.com/business-and-practice/voyager-investor-suit-against-firm-shows-risk-of-crypto-advice (accessed February 16, 2024).

4.       One of S&C's main, young lawyers was Mr. Ryne Miller.[3]



5.       On the eve of FTX's bankruptcy, Mr. Miller texted all FTX and Alameda officials:



---

[3]       After both Dan Friedberg and Can Sun resigned from FTX, Mr. Miller was left as the senior lawyer for FTX US, and Tim Wilson, who had also previously worked at S&C, as the remaining attorney for FTX International. According to the *Financial Times*: "Ryne saw the FTX situation as similar to the Merrill Lynch situation or Lehman in 2009," said a former colleague. Miller's former firm had handled Lehman, the largest bankruptcy in US history.

6.  One of the first FTX Insider Defendants[4] to express a willingness to resolve those claims and assist the victims, was former FTX Chief Compliance Officer, Mr. Dan Friedberg. It is apparent that Mr. Friedberg and S&C are at odds with respect to each other's involvement in FTX. S&C filed an adversary proceeding in the FTX Bankruptcy against Mr. Friedberg after he filed an extensive Sworn Declaration in support of opposing the appointment of S&C as lead bankruptcy counsel for the FTX Debtors, including specific facts and alleged evidence against S&C. *See* **Exhibit 1**. Mr. Friedberg also filed a Declaration before *this Court,* regarding the nexus between FTX's operations and Miami. *See* **Exhibit 2**. Undersigned Counsel has unsuccessfully tried for many months to amicably discuss obtaining any discovery or information from S&C or regarding its involvement in FTX, including setting depositions of Messrs. Miller and Friedberg.[5]

7.  The actions taken by S&C to blame SBF for the FTX Group's[6] collapse, while downplaying any of its own involvement, has already drawn scrutiny from regulators. Specifically, Senators John Hickenlooper, Thom Tillis, Elizabeth Warren, and Cynthia Lummis all sent a letter to Judge John Dorsey, urging the appointment of an independent examiner to investigate FTX's collapse.[7] They highlighted the specific conflict of interest due to Sullivan & Cromwell's role as legal advisors to FTX, including Mr. Miller's role as FTX's general counsel. The Senators raised concerns about the firm's ability to conduct an impartial investigation into the fraud. They stressed

---

[4] "FTX Insiders," or "Insiders" refers to FTX Insider Defendants, which include Samuel Bankman-Fried ("SBF"), Caroline Ellison, Nishad Singh, and Gary Wang, as well as other insiders, including Ryan Salame, Ramnik Arora, Zach Dexter and Dan Friedberg.

[5] *See* **Exhibit 3**. Plaintiffs' Counsel also had many calls and discussions directly with S&C counsel, Brian Glueckstein, regarding third party subpoenas and document requests served on S&C, which S&C moved to quash in New York state court on January 31, 2023.

[6] FTX Trading Ltd. and its subsidiaries are referred to herein as "FTX Trading" or "FTX Trading Ltd." West Realm Shires Inc. and its subsidiaries, including West Realm Shires Services, Inc. ("WRS"), are referred to herein as "FTX US." FTX Trading Ltd. and FTX US are collectively referred to as "FTX" or the "FTX entities." FTX and Alameda Research, LLC and its subsidiaries ("Alameda") collectively make up the "FTX Group."

[7]   https://www.warren.senate.gov/oversight/letters/warren-hickenlooper-tillis-lummis_raise-conflict-of-interest-concerns-about-law-firms-role-in-ftx-bankruptcy-investigation-urge-court-to-appoint-independent-examiner (accessed February 16, 2024).

the importance of an independent examination to restore trust and inform future digital asset legislation.[8]

8.     On January 13, 2023, the US Trustee representing the interests of the Department of Justice in FTX's bankruptcy proceedings, submitted a letter objecting to S&C's appointment. First, he stated that S&C's disclosures were "insufficient to evaluate whether S&C satisfies the Bankruptcy Code's conflict-free and disinterestedness standards."[9] And second, "S&C's close connection with an insider of the Debtors" rendered "S&C too conflicted to investigate Debtors' downfall." Mr. Vara concluded that the FTX Debtors' application to retain S&C as lead counsel omitted the fact that Ryne Miller had been a partner at S&C, nor did it provide any detail about the type of services S&C provided to FTX pre-bankruptcy.[10]

9.     According to some FTX Insiders, S&C decided to intentionally keep FTX US Derivatives (formerly LedgerX) out of the FTX bankruptcy proceedings, with knowledge that it was in possession of approximately a quarter billion dollars of diverted _FTX customer funds_ from which it could (and has) extracted significant revenue.[11] In fact, from November 2022 to mid-January 2024, S&C's income from matters just related to FTX has surged, exceeding $180 million—or 10% of the _total_ revenue the 900-lawyer firm publicly stated it collected in _all_ of 2022—with paralegals billing $595/hr. and partners billing up to $2,165/hr.[12]

10.     More specifically, some currently allege that S&C _filed_ the FTX Bankruptcy: (1) with no proper authority, and (2) may have been "clouded by the benefits of potential employment." _See_ "Combined Reply in Support of Motions to Dismiss Bankruptcy Cases of FTX

---

[8]     The reason S&C's extensive work with other crypto companies is important is because these competitors offered nearly identical types of "tokens" and "crypto interest accounts," and S&C was in charge of  negotiations with the SEC, who were strenuously arguing all similar products constituted the sale of unregistered securities.

[9]     https://restructuring.ra.kroll.com/FTX/Home-DownloadPDF?id1=MTQzODMzMw==&id2=-1

[10]     It appears that more important information may not have been revealed by S&C, including whether Mr. Miller was paid $500,000 of his salary directly from Alameda, as opposed to the $500,000 that was admittedly just paid by FTX.

[11]     https://www.nytimes.com/2023/09/05/technology/crypto-collapse-lawyers-turnaround-specialists.html (accessed February 16, 2024)

[12]     https://news.bloomberglaw.com/business-and-practice/sullivan-cromwell-wins-big-in-ftx-silicon-valley-bank-wrecks (accessed February 16, 2024).

Trading Ltd. and Maclaurin Investments Ltd. filed by Patrick Gruhn, Robin Matzke, and Lorem Ipsum UG," Case 22-11068, [D.E. 5409] ("The *Lorem* Action").[13]

11.     For example, S&C served as lead counsel for FTX's crypto competitor BlockFi. The Securities and Exchange Commission charged BlockFi with failing to register the offers and sales of its retail crypto lending product. To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its <u>unregistered offers</u> and sales of the lending product, BlockFi Interest Accounts (BIAs), BlockFi also agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

12.     S&C served as lead counsel for BlockFi and according to S&C' website:

BlockFi announced plans to register with the Securities and Exchange Commission to offer BlockFi Yield, a new interest-bearing crypto account. BlockFi Yield will replace BlockFi Interest Accounts (BIAs) for U.S. clients, following a settlement with the SEC and state regulators that clarified regulatory questions surrounding cryptocurrency lending practices.

BlockFi Lending is the first company to settle with the SEC or state regulators regarding interest-bearing crypto accounts, and its parent, BlockFi Inc., is the first to announce plans to register an interest-bearing crypto account product. BlockFi Yield will allow crypto holders to earn monthly interest on crypto assets. As of December 2021, BlockFi Lending and its affiliates held more than $10 billion in BIA assets and had more than 570,000 BIA clients, including more than 390,000 clients in the United States.[14]

---

[13]     Author Michael Lewis had unfettered access to SBF, and in his book, *Going Infinite: The Rise and Fall of a New Tycoon,* he detailed on the role of S&C in pushing FTX into bankruptcy and prearranging the appointment of John Ray as CEO. According to Lewis, John Ray received a text message several days before the petition filing, "asking him to sit tight because something big might be coming his way." The Wednesday before the filing, Ray received a text stating "It's insane. I'll try to get back to you later." *Id.* at 232. Then, at 12:33am on Friday November 11, 2022, the S&C attorney texted Ray: "they are still considering whether you are the right candidate for the job." Two hours later, the attorney texted: "SBF has gone underground." Lewis then notes that "[a]s a legal matter, at 4:30 in the morning on Friday, November 11, 2022, Sam Bankman-Fried DocuSigned FTX into bankruptcy and named John Ray as FTX's new CEO." But "[a]s a practical matter, Sullivan & Cromwell lined up John Ray to replace Sam as the CEO of FTX, and then John Ray hired Sullivan & Cromwell as the lawyers for the massive bankruptcy."

*According to Lewis, in the days leading up to the petition, lawyers for S&C told SBF that if "he didn't sign the documents, he was going to be thrown into bankruptcy by various barbaric counties." Id. at 233.*

[14] On the compensation request submitted by S&C to the bankruptcy court, for legal work it performed for the FTX Group in the last 19 days of November, the name BlockFi appears 57 times.

13.     BlockFi completed its own bankruptcy proceedings in the U.S. Bankruptcy Court for the District of New Jersey, with over $1 billion exposure in loans and locked up assets at SBF's related companies. Gemini's interest bearing Earn program was also exposed to FTX through its partnership with Genesis.[15]

14.     Under Bankruptcy Code Section 327(a), attorneys hired by the bankruptcy estate cannot hold or represent an interest adverse to the estate and must be "disinterested persons." Sullivan & Cromwell partner, Andrew Dietderich, told the court the following:

> Based solely on the conflicts procedures described herein, (i) S&C is not aware of any conflict between its representation of the Debtors and its representations of its Current Clients or Former Clients that would cause S&C not to be a 'disinterested person,' (ii) S&C does not represent any person or entity having an interest adverse to the Debtors in connection with these chapter 11 cases. . . . [16]

15.     Some creditors filed objections to S&C serving as Lead Counsel:

> Sullivan & Cromwell was one of the FTX Group's 'primary external law firms' before the FTX Group collapsed. To date, the FTX Group has paid the firm more than $20.5 million in fees and retainers. Now, in the most flagrant attempt by a fox to guard a henhouse in recent memory, Sullivan & Cromwell has applied to be appointed the FTX Group's bankruptcy counsel with duties that would include 'investigating all potential estate causes of action'....

---

In 6 of those instances, the billable hours were described as involving the "BlockFi adversary proceeding" or "BlockFi adversary action."

[15]     https://ag.ny.gov/press-release/2023/attorney-general-james-sues-cryptocurrency-companies-gemini-genesis-and-dcg (accessed February 16, 2024).

[16]     It appears S&C may have had some involvement in the BlockFi adversary action with FTX. BlockFi was claiming ownership of more than half a billion dollars in shares of Robinhood, a trading app, which were 90 percent-owned by SBF through an offshore vehicle called Emergent Fidelity Technologies, Ltd. The shares were pledged as collateral for $680 million in loans that Alameda Research owed BlockFi.  The Department of Justice believed that SBF may have been attempting to hide his investment, by setting up the offshore vehicle, Emergent Fidelity Technologies Ltd. in Antigua, to hold the shares. The registration for Emergent Fidelity Technologies, Ltd. was filed on April 22, 2022 in Antigua.

Federal prosecutors for the Southern District of New York stated that "the original circumstances of the purchase of these shares, through a foreign special purpose vehicle with no public connection to FTX or Alameda, further indicate the steps the defendant has taken to obscure his criminal misuse of FTX customer property." Mr. Miller at that time was General Counsel for FTX US in August of 2021 and listed himself as the contact person on the Securities and Exchange Commission filing for this Robinhood stock purchase.

16.     The Third Circuit Court of Appeals recently ruled that an "Independent Examiner" should have been appointed to oversee administration of the FTX bankruptcy proceeding, so the Examiner could investigate any and all liable parties, including S&C. The Third Circuit held that the plain text of Section 1104(c)(2) requires the appointment of an examiner under the specified conditions set forth. *See In re FTX Trading,* No. 23-2297, 2024 U.S. App. LEXIS 1279 (3d Cir. Jan. 19, 2024). This ruling directly questions the Bankruptcy Court's earlier findings regarding the appropriateness of retaining S&C as debtor's counsel without further investigation into potential conflicts of interest. The Third Circuit concluded that the FTX case would specifically benefit from "much-needed elucidation," and that further investigation into FTX's prepetition practices had the potential to reveal further undisclosed mismanagement that could continue to affect the public upon confirmation of FTX's reorganization plan.[17]

17.     SBF now faces up to 110 years in prison for orchestrating the scheme, following his November 3, 2023 conviction on charges including fraud, conspiracy, and money laundering in swindling billions of dollars from FTX customers. Billions of dollars have been stolen from customers across the globe. While customers of FTX, Class Members, lost everything, S&C was able to gain millions from the FTX fraud. S&C served as primary legal counsel to FTX for the 16 months preceding FTX's collapse, during which time S&C billed around $8.5 million in fees.

**Mr. Miller and FTX**

18.     S&C's involvement with FTX began during the summer of 2021, when FTX announced the hiring of Ryne Miller, a former S&C partner, as the new General Counsel for FTX US. Mr. Miller was also paid by, and worked for, both Alameda and FTX Trading. Unlike many other FTX officers and employees, Mr. Miller insisted on being paid solely in USD, and not in cryptocurrency or options in FTX or any of the FTX entities.

---

[17] In fact, FTX Bankruptcy Judge John T. Dorsey, previously explained with great reasoning why debtor's conduct both pre- and post-petition can be the grounds for actions:

> The 'fresh start' provided by the Bankruptcy Court cannot be both a sword and a shield. The Debtors made the decision to wield the sword when they filed for bankruptcy in order to escape the crushing volume of litigation they forced. But they also decided to continue, post-petition. to [violate the law]…**If it turns out that they are violating the law by doing so, they cannot then us ethe Code's 'fresh start' policy as a shield to escape liability for that decision. (e.s.)**

*In re Mallinckrodt PLC,* U.S.B.C. 20-12522 (Bankr. D. Del. Oct. 19, 2021).

19.     In announcing Mr. Miller's hire, FTX touted his ability to "grow [the FTX] presence in the US and expand on its mission in delivering trust, transparency, and credibility to the industry," because Mr. Miller had requisite experience in securities and derivatives, promising that FTX would "remain[] responsive to, and compliant with, emerging US and global regulatory policies." To be sure, Brett Harrison, President of FTX US, announced upon Mr. Miller's hiring that FTX US "share[s] with [US regulators] the desire to establish digital assets as a safe and reliable investment vehicle, and with Ryne" Miller, FTX US is "confident [it] will serve as a helpful resource in achieving that goal."

20.     While a partner at S&C, Mr. Miller was mentored by Andrew Dietderich and Mitchell Eitel, and was Co-Head of S&C's Commodities, Futures & Derivative practice. Mr. Miller possessed additional experience as a former attorney at the U.S. Commodity Futures Trading Commission ("CFTC"), where he worked under now Securities and Exchange Commission ("SEC") Chairman, Gary Gensler. Mr. Miller's connections, which the FTX Group viewed as critical to "forg[ing] cooperative working relationships with US regulators," were a major reason SBF sought to hire Mr. Miller to occupy a major role at FTX US.

21.     Mr. Miller's departure from S&C solidified S&C's involvement in FTX's continued growth and expansion. S&C's Chairman, Joseph Shenker, confirmed that S&C was still "very much look[ing] forward to continuing to work with [Mr.] Miller and FTX[] US." In January 2022, roughly six months after FTX US brought Mr. Miller onboard, FTX US was valued at $8 billion, stemming from a $400 million first-round funding from investors, as well as from acquisitions and regulatory applications on which S&C advised.

22.     Immediately after FTX hired him, Mr. Miller made it his priority to provide business to S&C as outside counsel (as evidenced by 20 separate engagements in a few short years relating to regulatory hurdles and mergers and acquisitions, which resulted in attorneys' fees exceeding $8 million), making S&C one of the FTX Group's chief providers of legal counsel alongside its corporate counsel, Fenwick & West. S&C's representation of FTX was expansive and included regulatory matters, mergers & acquisitions, bankruptcy litigation, personal representation of FTX Insider Defendants, representation on both sides of various deals with other entities, and most recently in the administration of the FTX bankruptcy proceedings.

23.     While Mr. Miller stood on one side of the FTX/S&C bridge, Andrew Dietderich, who is the co-head of S&C's Global Finance & Restructuring Group and is known as one of the

leading transactional restructuring lawyers, stood on the other. Having mentored Mr. Miller, Mr. Dietderich had strategically positioned himself and his law firm to serve as primary counsel for FTX Group. Other partners of S&C involved in managing its representation of the FTX Group included Mitchell Eitel, another one of Mr. Miller's mentors at S&C. Throughout his tenure as General Counsel at FTX Group, Mr. Miller reportedly kept in near constant contact with Messrs. Dietderich and Eitel through the Signal App and other means of communication, keeping them informed as to FTX Group's inner workings.

24.     Several matters that S&C pursued on behalf of the FTX Group gave S&C an in-depth and detailed look into the true inner workings of the FTX Group's fraudulent enterprise. Notably, S&C counseled FTX's bid for the assets of Voyager, another cryptocurrency exchange, in bankruptcy (*In re Voyager Digital Holdings, Inc.*, Case No. 22-bk-10943 (Bankr. S.D.N.Y.) ("*Voyager*")), as well as FTX's acquisition of LedgerX LLC ("LedgerX"), which granted S&C a view into the finances of FTX and visibility of the FTX fraud.

25.     One of Mr. Miller's first engagements of S&C as outside counsel was related to FTX US's acquisition of Miami-based LedgerX, for which FTX paid S&C approximately $1,513,000 in fees and costs. Helmed by over a dozen S&C lawyers led by another of Mr. Miller's mentors, Mr. Eitel, the LedgerX transaction was designed to provide FTX US with a CFTC-regulated Designated Contract Market, Swap Execution Facility, and Derivatives Clearing Organization, which was meant to help FTX in "further developing a strong working relationship with the U.S. regulatory community." The connections Mr. Miller developed while at S&C with government regulators were crucial to the success of this deal. It appears that FTX purchased LedgerX in Miami with diverted FTX customer funds.

26.     Through its work on the LedgerX acquisition and work in connection with LedgerX (d/b/a FTX US Derivatives) thereafter, S&C was privy to a software audit of the FTX systems, which Mr. Miller and then-CEO of LedgerX, Zach Dexter, oversaw. According to FTX Insiders, Mr. Miller became aware through that audit of the "back door" in the FTX Platform[18] code that allowed SBF and his inner circle to embezzle FTX customer funds by funneling them to Alameda, and communicated that fact to his mentors, Messrs. Dietderich and Eitel, and others at S&C. It

---

[18] "FTX Platform" or "Deceptive FTX Platform" refers to the various platforms FTX created for investors to access crypto and related markets.

does not appear that Mr. Miller nor S&C disclosed the "back door" to anyone until well into the FTX Bankruptcy.

27.     Following the LedgerX acquisition, FTX again retained S&C and paid the firm over $662,000 in fees and costs for advice regarding FTX's application to the CFTC to amend LedgerX's Derivatives Clearing Organization (DCO) license to allow LedgerX to clear margined future contracts. Mr. Miller's connections with regulators again proved to be crucial, as he and other S&C attorneys purportedly engaged in many months of informal discussions with CFTC staff in order to maneuver the FTX Group into a position that would enable it to prepare a convincing application. These efforts culminated in a public roundtable, attended by SBF and several of his employees, held at the CFTC to discuss intermediation in derivatives trading and clearing, which was precipitated by LedgerX's application.[19] S&C's lawyers now state in open court that "LedgerX was a horrible investment by FTX." Transcript of January 31, 2024 hearing in FTX Bankruptcy.

28.     One such machination was the creation of a $250 million fund that SBF referred to as an "Over-Capitalized and Conservative Guaranty Fund" (the "FTX Guaranty Fund"), the claimed purpose of which was to protect depositors by absorbing losses sustained by other users on the FTX Platform. With the FTX Guaranty Fund and other purported risk mechanisms in place, FTX represented to the CFTC that "FTX has gone above and beyond the regulatory requirements and well above what is necessary or required based on our experience over the past years of operation internationally." That was not true, as S&C knew from its work advising on FTX's application and supporting testimony to the CFTC.

29.     While SBF and FTX touted the $250 million FTX Guaranty Fund to regulators as a fund comprised of $250 million worth of FTX assets, on information and belief these funds were actually comprised, in whole or in part, of FTX customer funds, diverted by SBF and/or FTX Insiders Nishad Singh or Gary Wang, as follows: Alameda diverted the funds from the FTX Platform through the "back door," and transferred the funds to SBF, Mr. Singh, and/or Mr. Wang as unsecured "loans" from Alameda.

30.     Indeed, an internal ledger produced in connection with the criminal trial of SBF shows that, in the weeks leading up to FTX's CFTC application, more than $300 million flowed

---

[19] https://www.cftc.gov/PressRoom/PressReleases/8519-22 (Accessed February 16, 2024).

to SBF, Nishad Singh and Gary Wang for "LedgerX" and $250 million flowed to SBF for "insurance fund" in this way. Upon information and belief, SBF, Mr. Singh, and/or Mr. Wang, in turn used those diverted funds to purchase shares of FTX US. FTX US then placed those funds into a LedgerX account to underwrite the FTX Guaranty Fund.

31.     These transactions were routed through Emergent Fidelity Technologies Ltd ("Emergent"), an Antiguan entity through which the FTX Group laundered many fraudulent transactions of customer funds, and for which S&C reportedly served as "primary counsel."

32.     When the FTX fraud was revealed in November 2022, Mr. Miller and S&C moved to consolidate power over the FTX Group without delay, quickly ousting SBF and his lieutenants and appointing in their stead hand-picked successors to navigate FTX through the bankruptcy process. S&C's post-collapse maneuvering seems particularly calculated, given that S&C was well positioned to see the collapse coming, via knowledge gleaned from prior engagements.

33.     Mr. Miller and S&C moved to divert the $250 million FTX Guaranty Fund from LedgerX, one of the few entities S&C specifically chose not to include among the over 100 FTX entities it forced into bankruptcy, in order to secure receipt of a multi-million-dollar retainer to S&C before the FTX Group filed for bankruptcy, presumably to improve the Firm's revenues throughout the extensive FTX bankruptcy process. With S&C's assistance, SBF and FTX caused billions in losses to Plaintiffs through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

34.     First, FTX stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF, all while publicly touting the safety of the investment and the segregation of customer funds. The deceptive FTX Platform maintained by the FTX Group was truly a house of cards, representing a fraudulent scheme whereby the FTX Group shuffled customer funds between its opaque affiliated entities, using new investor funds obtained through investments in the deceptive FTX Platform, the yield-bearing accounts ("YBA"), FTX's native cryptocurrency token ("FTT"), and/or loans to pay interest and investment withdrawals to the prior investors, to attempt to maintain the appearance of liquidity.

35.     Second, FTX offered and sold securities without proper registration, depriving Plaintiffs of financial and risk-related disclosures that would have impacted their decision whether

11

to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

36.     Doomed from the start, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware. The FTX Group's bankruptcy proceeding is likely to continue for many years, with no guarantee that any of the victims will be able to see full recovery from those proceedings. The class action, pending in the Southern District of Florida as an MDL, may be the only avenue for victims to recover their damages in full.

37.     As outlined in several complaints already filed in the MDL, the MDL Defendants[20] directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar fraud for their own financial and professional gain. S&C was one of FTX US's principal outside law firms and its conduct mirrors that of the other MDL Defendants. This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, aiding and abetting fraud, negligence, breach of fiduciary duties, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

38.     S&C provided services to the FTX Group entities that went well beyond those a law firm should and ordinarily provides. As the evidence will reveal, S&C lawyers were eager to craft not only creative, but misleading strategies that furthered FTX's misconduct. As several members of Congress recently remarked, these and other services are "often central to major financial scandals, given [legal counsel's] role in drafting financial agreements, risk management

---

[20] "MDL Defendants" collectively refers to all Defendants named in the Administrative Class Action Complaints filed in the MDL Court, including, but not limited to: Samuel Bankman-Fried, Caroline Ellison, Gary Wang, Nishad Singh, Prager Metis CPAs, LLC and Armanino LLP, Sequoia Capital Operations, LLC, Thoma Bravo, LP, Paradigm Operations LP, SkyBridge Capital II, LLC, Multicoin Capital Management LLC, Tiger Global Management, LLC, Ribbit Management Company, LLC, Altimeter Capital Management, LP, and K5 Global Advisor, LLC, Sino Global Capital Limited ("Sino Global"), Softbank Group Corp., Temasek Holdings (Private) Limited, Temasek International (USA) LLC, Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, Golden State Warriors, LLC, Shaquille O'Neal, William Treavor Lawrence, Shohei Ohtani, Noami Osaka, Solomid Corporation d/b/a Team Solomid, TSM and/or TSM FTX, Graham Stephan, Andrei Jikh, Jaspreet Singh, Brian Jung, Jeremy Lefebvre, Tom Nash, Erika Kullberg, Creators Agency, LLC, Deltec Bank & Trust Company Ltd., Farmington State Bank, and Fenwick & West, LLP.

compliance practices, and corporate controls." S&C is no different, and the services and strategies it provided to the FTX Group were important to the eventual FTX Group's fraud.

39.     Moreover, the role of lawyers in these crypto Ponzi schemes takes on added significance due to the one of the central questions of these cases being a legal question: whether the tokens and interest-bearing accounts are classified as securities. Law firms like S&C, Fenwick & West, and McCarter & English, through their work for entities like FTX, BlockFi, and Voyager, played a crucial role in navigating and interpreting securities law for these platforms, used to pass the check of regulators and convinced others to invest.

40.     S&C had already significantly benefited from their association with FTX pre-bankruptcy by securing over $8.5 million in fees within the 16 months leading up to the exchange's collapse. However, the windfall for S&C exploded in the aftermath of FTX's bankruptcy filing. Since taking a leading role, S&C's income from matters related to FTX has surged, exceeding $180 million—or 10% of the *total* revenue the 900-lawyer firm publicly stated it collected in *all* of 2022—with paralegals billing $595/hr. and partners billing up to $2,165/hr.[21] When combined with other advisers working on the case, approved fees for the first nine months alone eclipsed $300 million, making FTX "one of the highest, if not the highest," burn rates for any bankruptcy, said Nancy Rapoport, a University of Nevada Las Vegas law professor.[22]

41.     SBF himself attempted to shift some of the blame onto S&C during his own recent criminal trial, mirroring familiar reliance on counsel defense strategies observed in numerous crypto-related legal battles, including the case against McCarter & English for its role in causing major losses to customers of the Voyager Digital cryptocurrency exchange.[23]  SBF tried to argue that, in some ways, he was merely following S&C's guidance, which, in his view, contributed to the missteps leading to FTX's downfall, though District Judge Lewis A. Kaplan, presiding over

---

[21]     https://news.bloomberglaw.com/business-and-practice/sullivan-cromwell-wins-big-in-ftx-silicon-valley-bank-wrecks (accessed February 16, 2024).

[22] *Id.*

[23] *Karnas, et al. v. McCarter & English, LLP, et al.* Case No. 1:24-cv-20480-RKA (S.D. Fla.) The *Karnas* plaintiffs allege that McCarter & English issued a phony legal opinion asserting that Voyager's VGX token and related accounts were not securities, effectively green-lighting activities that later came under scrutiny for fraud.

SBF's trial, properly restricted the inclusion of this proposed testimony, because it was simply not a defense to SBF's pending claims.[24]

## I.     PARTIES

42.     **Plaintiff Brandon Orr** is a citizen and resident of the State of Arizona. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Orr purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Orr has sustained damages for which the Defendant is liable.

43.     **Plaintiff Leandro Cabo** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which the Defendant is liable.

44.     **Plaintiff Ryan Henderson** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Henderson purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Henderson has sustained damages for which the Defendant is liable.

45.     **Plaintiff Michael Livieratos** is a citizen and resident of the State of Connecticut. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Livieratos purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Livieratos has sustained damages for which the Defendant is liable.

46.     **Plaintiff Alexander Chernyavsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Chernyavsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Chernyavsky has sustained damages for which the Defendant is liable.

---

[24] https://www.nytimes.com/2023/10/10/technology/sam-bankman-fried-trial-lawyers-judge.html (accessed February 16, 2024).

47.     **Plaintiff Gregg Podalsky** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Podalsky purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Podalsky has sustained damages for which the Defendant is liable.

48.     **Plaintiff Vijeth Shetty** is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Shetty purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Shetty has sustained damages for which the Defendant is liable.

49.     **Plaintiff Chukwudozie Ezeokoli** is a citizen and resident of the State of Illinois. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ezeokoli purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Ezeokoli has sustained damages for which the Defendant is liable.

50.     **Plaintiff Michael Norris** is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Norris purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Norris has sustained damages for which the Defendant is liable.

51.     **Plaintiff Edwin Garrison** is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Garrison has sustained damages for which the Defendant is liable.

52.     **Plaintiff Shengyun Huang** is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Huang purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Huang has sustained damages for which the Defendant is liable.

53.      **Plaintiff Julie Papadakis** is a citizen and resident of the State of Virginia. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Papadakis purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Papadakis has sustained damages for which the Defendant is liable.

54.      **Plaintiff Vitor Vozza** is a citizen and resident of the Federal Republic of Brazil. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Vozza has sustained damages for which the Defendant is liable.

55.      **Plaintiff Kyle Rupprecht** is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which the Defendant is liable.

56.      **Plaintiff Warren Winter** is a citizen and resident of the Federal Republic of Germany. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Winter purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which the Defendant is liable.

57.      **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the Defendant's wrongdoing and the specific allegations set forth herein, Plaintiff Kavuri has sustained damages for which the Defendant is liable.

58.      **Defendant Sullivan & Cromwell LLP** is an unincorporated limited liability partnership organized under the law of New York with offices throughout the country.

59.      S&C touts its Digital Assets Practice on the firm's Website as leveraging "the Firm's premier Financial Services and FinTech practices to advise a variety of industry members

on their most significant blockchain, digital assets and currencies, and cryptocurrency-related legal and business issues. The multidisciplinary group consists of lawyers across several practice groups at the Firm who collaborate seamlessly to solve our clients most novel issues"–highlighting its expertise in this area.

60.     S&C's client base includes industrial and commercial companies; financial institutions; private funds; governments; educational, charitable, and cultural institutions; and individuals, estates, and trusts. The firm generates on average more than $1.7 billion in revenue each year.

## II.     JURISDICTION & VENUE

61.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 because this is a civil action arising under the Constitution, laws, or treaties of the United States and because all other claims herein are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

62.     This Court further has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which at least one class member is a citizen of a state different from any defendant and in which at least one class member is a citizen or subject of a foreign state and any defendant is a citizen of a State.

63.     This Court has personal jurisdiction over Defendant under Section 48.193(1)(a)(2) of the Florida Statutes because it not only engaged in a conspiracy in which some of the co-conspirators—some of whom are MDL Defendants—promoted, marketed, and sold FTX's Deceptive FTX Platform, YBAs and/or FTT in Florida, but it also directly engaged in conduct amounting to a conspiracy with FTX US, which was headquartered in Florida (along with LedgerX (d/b/a FTX US Derivatives)), and FTX's inner circle, including FTX US General Counsel Ryne Miller, and which conduct constitutes committing a tortious act within the state of Florida. *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1352 (S.D. Fla. 2022) (quoting *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp. LLC*, 608 F. Supp. 2d 1349, 1354 (S.D. Fla. Mar. 31, 2009) (Hurley, J.)) (internal quotations omitted). Defendant's purposeful availment renders the exercise of jurisdiction by this Court over Defendant permissible under traditional notions of fair play and substantial justice.

17

64.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants advised on transactions and/or received substantial profits from Class Members who reside in this District.

### III.     FACTUAL ALLEGATIONS

#### A.  The Rise of FTX

65.     In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates, and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

66.     FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused on profits and customer protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.

67.     All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on customer protection and did not segregate customer funds. Instead, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

68.     FTX was conceived in California before transitioning its headquarters to Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

69.     Beginning no later than early 2019 for FTX Trading and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" and/or other accounts and

18

deposit a wide assortment of cryptocurrencies, as well as fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or FTX's mobile app.

70.     FTX lured Class Members to make such deposits with promises of a guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and a guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds.

71.     By structuring the rates of returns in this way, FTX targeted nascent customers new to investing—*i.e.*, those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

72.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX[] US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX[] US Account shall at all times remain with you and shall not transfer to FTX[] US.;" and that "FTX[] US does not represent or treat assets in your FTX[] US Account as belonging to FTX[] US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading" and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

73.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)." In addition, FTX posted a document on its website entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms." The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."

74.     FTX also promised to protect against the risk that customers would self-deal on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a

party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX[] US does not permit self-trades in order to manipulate markets, reported statistics, or cause liquidations."

75.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and liquidated that customer's assets if the customer failed to do so. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the CFTC, in which FTX sought permission to trade non-intermediated margin products (*i.e.*, without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

76.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

77.     At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

78.     More generally, in television commercials, print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto" and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist this misrepresentation in a letter dated August 18, 2022.

79.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF became "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

80.     But in truth, SBF *did* want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

81.     Based on these reassurances and other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world. At its peak, the exchange's trading volumes reached approximately $21 billion *per day,* and its valuation topped $32 billion within three years of its founding.

**B.  FTX's Key Insider Players**

**(1)     *Sam Bankman-Fried***

82.     The FTX Group was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by Samuel Bankman-Fried, Gary (Zixiao) Wang, and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established to build a digital asset trading platform and exchange for a better user experience, customer

protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

83.     Prior to that, the Silicon Valley-born, MIT-educated SBF, launched his quantitative crypto trading firm, Alameda, in November 2017, after stints in the charity world and at trading firm Jane Street. Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

84.     On January 3, 2023, SBF pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in *USA v. SBF*, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. *Id.,* Doc. 80.

85.     Following his conviction in November 2023, SBF faces over 100 years in prison for crimes predicated on his stealing billions of dollars of his customers' money.

**(2)     *Caroline Ellison***

86.     By 2018, SBF had persuaded Ms. Ellison to join him at Alameda.

87.     In or around 2019, the headquarters of Alameda was relocated to Hong Kong, though it continued to maintain an office in California at all times through the collapse of FTX. The team at Alameda included SBF's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang, as well as Carlone Ellison and prominent insider Ryan Salame.

88.     After SBF established FTX in 2019, Ms. Ellison began taking more responsibility at Alameda.

89.     In mid-2021, Ms. Ellison was appointed as co-CEO of Alameda with Sam Trabucco after SBF resigned from the firm to give the appearance of putting distance between the exchange and trading shop he founded. As co-CEO, Ms. Ellison helped oversee Alameda's expansion beyond its initial market-neutral but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi). Ms. Ellison became sole CEO in August 2022, following Mr. Trabucco's sudden and unexpected departure from the firm, when he shifted his role from Co-CEO to adviser of the company.

90.     Leading up to the collapse of FTX, Ellison and ten FTX or Alameda colleagues lived in SBF's $30 million penthouse in the Bahamas.

91.     In December 2022, Ms. Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

### (3)   *Gary Wang*

92.     Mr. Wang met SBF at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Mr. Wang got degrees in mathematics and computer science, and SBF received a bachelor's in physics.

93.     Before co-founding Alameda (and later FTX), Mr. Wang worked at Google. According to an introduction on the Future Fund's website, he claims to have built a system to aggregate prices across public flight data. When SBF left the Jane Street Hedge Fund to start Alameda in 2017, Mr. Wang left the tech giant. The startup began in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else. It is there that Mr. Wang and SBF funneled funds from Alameda to build its bespoke derivatives exchange. SBF told Insider he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."

94.     At the age of 28, Mr. Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Mr. Wang in public, tweeting that "I couldn't be prouder" when the list came out. In December 2022, Mr. Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

### (4)   *Nishad Singh*

95.     Nishad Singh joined Alameda in the early days when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

96.     Mr. Singh is and was a close confidant of SBF, having shared multiple apartments with the FTX founder over the years, including, most recently, a 10-person luxury penthouse in Nassau, the Bahamas. "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," SBF wrote in a company

blog. Mr. Singh also assisted Mr. Wang in building most of FTX's "technological infrastructure" and managed the development team.

97.     He is rumored to be just one of three people who controlled the keys to the exchange's matching engine and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.

98.     Mr. Singh has previously talked about why he left his dream job at Facebook to join Alameda in an FTX podcast.

99.     "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Mr. Singh said.

100.    Mr. Singh visited Alameda in the first month of its existence, where he witnessed SBF execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

101.    After spending one and a half years as a core Alameda engineer, Mr. Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019." He has provided code to a number of SBF-related projects, including the decentralized exchange Serum on Solana.

102.    Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys. A similar relationship may be in place at FTX's core properties.

103.    On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into SBF and apologized for his role in FTX's scheme.

### C.  The Basics of a Cryptocurrency Exchange

104.    Cryptocurrency exchanges accept cryptocurrency deposits and often fiat currency on behalf of their customers. Once the exchange receives that cryptocurrency, it has dominion and control over those assets.

105.    The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

106.    If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange and:

   a)  Trade it for another cryptocurrency

   b)  Trade it for fiat currency

   c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

   d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

107.    FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. This means the customer does not *control* access to the assets "in" their account. The customer needs to request the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed depends on the exchange's willingness, ability, and approval. It is very much the exchange that controls the assets, not its customer.

108.    The main functional differences between banks and cryptocurrency exchanges are that exchanges are largely unregulated and that exchanges (and by extension exchange accounts and the users who use them) are subject to many additional risks compared to that of a bank account.

109.    Banks are subject to a variety of capital and liquidity requirements to ensure the protection of consumer assets. Bank regulations stipulate the type of assets in which they can invest customer deposits. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of customer funds. And deposit accounts at banks have FDIC insurance

so that bank account holders have coverage in case a bank, despite the measures in place to ensure safety and soundness, becomes insolvent.

110.    Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they "securely" store all customer assets 1:1 in "cold storage," there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or the general public.

### D.  The Mechanics of the FTX Fraudulent Scheme

111.    With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into speculative investments, including YBAs, on the FTX exchange.

112.    Contrary to FTX's representations to its customers that "FTX[] US does not represent or treat assets in your FTX[] US Account as belonging to FTX[] US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds with FTX Group funds in several "omnibus" accounts held by FTX.

113.    Under the cloak of this wide-ranging con game, FTX Insiders, including SBF, facilitated the routing of billions of dollars in purported profits of FTX, which were, in reality, Class Member funds, to the Insiders and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

114.    Frequently, SBF routed his fraudulent scheme through Alameda, a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

115.    Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entit[ies] . . . at arm's length," and,

despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

116.   Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time and key personnel and other resources critical to the companies' operations.

117.   SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties"; and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

118.   Other times, SBF misappropriated Class Member funds as "loans, including, for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other Insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any reason to believe that they would or could be repaid at the time the "loans" were made. The FTX Insiders effectively looted the company. Even during the crypto boom, the FTX Insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief, was any interest ever paid on the loans.

119.   More often, SBF looted Class Member funds directly, without the cover of sham-related party transactions or Insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars

above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 "ich [sic] Cell Phone" for the sale price of $899.00:

120.     Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

121.     SBF found diverse ways to misappropriate Class Members funds, including paying for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entry into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

122.     SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described herein, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay this line of credit, having spent the money on Insider transfers and purported "loans," gifts, and questionable investments.

28

123.    With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a *de facto* limitless line of credit.

124.    SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

125.    The improper relationship between Alameda and FTX was known to the companies' Insiders and completely concealed from Class Members. As Ms. Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.
>
> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. . . .

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong.

126.    Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.

127.    FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to …customers that Alameda had no such special privileges and people were likely … using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

128.    FTX had a handful of Insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on exercising these powers. FTX failed to establish or maintain fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function.

129.    FTX Insiders paid millions of dollars in hush money to keep whistleblowers from exposing fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

130.    At no time did FTX disclose the foregoing to Class Members, including that:

a)    SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

b) FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

c) FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

d) FTX and Alameda were not, in fact, "wholly separate entit[ies]" operating at "arm's length," and were instead operated as a common enterprise;

e) SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

f) SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

g) SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

h) Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

i) With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

j) FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

k) FTX did not have in place fundamental internal controls, including an independent board of directors or a CFO.

131.    Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange, and SBF's fraud would not have succeeded. In late 2022, the fraud finally collapsed, and the misconduct was revealed.

**E.   The FTX Fraud's Collapse**

132.    The FTX exchange was highly successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.

31

133.     FTX quickly became one of the most utilized avenues for nascent retail investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10 to $50 *billion dollars*.

134.     According to Bloomberg, SBF got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020.

135.     At his peak, SBF was worth $26 billion. At 30, he had become a major political donor, gotten celebrities, like the named MDL Defendants in this action, to promote FTX vociferously, and secured the naming rights to the arena where the NBA's Miami Heat play.

136.     Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT and, in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in several similar transactions, propping up failing crypto companies to keep the fraud alive as 2022 progressed.

137.     Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and sovereign wealth funds in the Middle East but could not successfully close any further investments in FTX despite many solicitations. Without this influx of capital, FTX's exposure to margin calls heightened, and in November 2022, SBF's house of cards finally collapsed.

138.     In early November 2022, crypto publication CoinDesk released a bombshell report that questioned just how stable SBF's empire was. On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading and eventually to cover Alameda's massive losses.

139.    Prior to the collapse of the FTX Group, SBF's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows SBF's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto.

140.    On November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange, and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32% but rallied once again with SBF's surprise announcement on Tuesday, November 8, that Binance would buy FTX, effectively bailing it out.

141.    But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. There are way too many issues. CZ." Binance cited findings during due diligence, reports of mishandled customer funds, and the possibility of a federal investigation. In truth, there were always too many issues — issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even further — SBF saw 94% of his net worth wiped out in a single day. This triggered panic selling of FTT and a run on FTX, ensuring the firm's swift demise.

142.    Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong, beginning with:[25]



---

[25] https://twitter.com/SBF_FTX/status/1590709166515310593 (accessed February 16, 2024)

### F. FTX Files for Bankruptcy

143. On November 11th, unable to obtain a bailout and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy, and SBF resigned as CEO.

144. At or around the same time as SBF's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked, which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."

145. FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises.

146. On December 13, 2022, the SEC filed a civil action against SBF for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.), which alleged:

> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of dollars of FTX customer assets, it was unable to satisfy its loan obligations. [SBF] directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. . . .
>
> Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

147. The SEC alleged that SBF "diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (*e.g.*, U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless 'line of credit' at FTX, which was funded by FTX customer accounts."

148. The bankruptcy court initially found deficiencies including:

*First*, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

*Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

*Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

**Fourth**, loans and other payments were made to insiders in excess of $1 billion.

**Fifth**, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

149.     Defining the "FTX Group" as a *de facto* singular entity comprised of FTX Trading, FTX US, and Alameda collectively, Mr. Ray begins by explaining that:

> Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

150.     The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were."

151.     The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a)   Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports";

b)   Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management";

c)   Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets;

d)   Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

e) "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly";

f) "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely";

g) the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail";

h) "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled and often approving expenses and invoices on Slack by "emoji";

i) "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and Insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to Insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future";

j) Often, intercompany and Insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger

as "Investment in Subsidiaries: Investments-Cryptocurrency," often recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred;

k) On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the Deceptive FTX Platform; and finally

152.    Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset."

### G.   Crypto Sector a Hotbed for Illicit Activity and Fraudulent Conduct

153.    From its inception, cryptocurrency has been fueled by illicit activity, and the crypto sector continues to be rife with fraud and scams. For a detailed breakdown of the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement in Detecting, Investigation, and Prosecuting Criminal Activity Related to Digital Assets." The report was issued pursuant to the March 9, 2022, Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released dating back to 2018, all of which detail the dire harms caused by cryptocurrency. The Department of Justice notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.

154.     Organized crime syndicates and nation-states are increasingly using cryptocurrency for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking." Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions. According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs." North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked, and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, U.S. deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."

155.     Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority of staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware. The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban or heavy regulation of cryptocurrency.

156.     Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency-related consumer complaints in its Consumer Complaint Database during 2021 and more than

1,000 cryptocurrency-related complaints during 2022 year-to-date. According to the September report by the Department of Justice: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams." In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than *any* other payment method." The median individual loss was a staggering $2,600.

### H.  S&C's Role in the FTX Fraud

157.    FTX could not have achieved fraud of such tremendous scale alone. S&C's immense resources, connections to regulators, expertise, and assistance were vital to perpetuating the scheme.

### a.  S&C Forms a Close Relationship with FTX via Ryne Miller.

158.    In August 2021, FTX US announced that Ryne Miller had joined as its General Counsel. Mr. Miller served not only as General Counsel for FTX US, but for Alameda and FTX Group as well.

159.    Mr. Miller's connections, developed during his three years as a lawyer with the CFTC and subsequent time at S&C interacting with government regulators, were a major reason he was hired. Mr. Miller positioned himself as the answer to FTX's CFTC licensing woes and other regulatory hurdles, underscoring his familiarity with SEC officials and his close relationship to "Gary" [Gensler], the SEC Commissioner, in particular. Mr. Miller's expertise was valuable to several entities under FTX and Alameda, and notably, his salary, which he took in USD (rather than options or crypto), was paid half by Alameda and half by FTX.

160.    Mr. Miller's departure from S&C to join FTX solidified S&C's involvement and interest in FTX's continued growth and expansion, with S&C's Chairman, Joseph Shenker, stating at the time that he was still looking forward to continuing to work with Miller and FTX US.

161.    Mr. Miller was not the only lawyer to come to FTX from S&C. FTX hired additional attorneys from S&C, including Tim Wilson (a former S&C associate from 2019 to 2021, whom Fenwick & West briefly employed before FTX hired him), as General Counsel for FTX Ventures Ltd., T'Shae Cooper, Alameda's General Counsel, and Kelly Yamashita, a former Alameda employee in Hong Kong, each of whom was an associate at S&C before joining the FTX Group and whom, upon information and belief, Mr. Miller recruited to the FTX Group.

### b. S&C's Involvement in FTX and Alameda Research

162.    At the time of Mr. Miller's hiring, Alameda faced a crisis of leadership. Mr. Miller promptly engaged his former firm, S&C, as outside counsel in a decision with self-serving ramifications as he wanted to return to S&C as a partner following his time at FTX.

163.    S&C provided legal services and other counsel to FTX, its subsidiaries, and its affiliates on wide ranging matters and with high frequency. Mr. Dietderich, who is known as one of the nation's leading transactional restructuring lawyers, testified as to the extended history of S&C's entanglements with FTX and its associated entities. Indeed, as SBF explained in the wake of FTX's collapse, S&C "was one of FTX [Trading]'s two primary law firms prior to bankruptcy, and was FTX US's primary law firm." S&C also acted as primary counsel to LedgerX (d/b/a FTX Derivatives), and Emergent, the Antiguan entity through which FTX laundered many of its fraudulent transfers of customer funds to its Insiders' pockets as further detailed herein.

164.    So close was the relationship between FTX and S&C that SBF would often work out of S&C's New York office and, before its collapse, FTX engaged S&C to work on more than twenty separate matters – three of which involved fees and expenses over $1 million, seven between $100,000 and $1 million, and ten up to $100,000.

165.    S&C's work for FTX included assisting "FTX US in its most important regulatory application, [it] worked with FTX [Trading] on some of its most important regulatory concerns, and [it] worked with FTX US on its most important transaction." The majority of the work done by S&C for FTX involved "M&A and third-party bankruptcy matters," as well as lobbying of and responding to regulatory authorities in the United States. These engagements are described in detail below.

#### i. The LedgerX Acquisition

166.    The "most important transaction" for FTX Group, and for which it hired S&C for counsel, was FTX US's acquisition of LedgerX in Miami—with work beginning no later than July 22, 2021. According to FTX Insiders, FTX US purchased Ledger X with FTX customer funds. LedgerX was a digital currency futures and options exchange regulated by the CFTC, which had granted licenses to LedgerX to operate as a Designated Contract Market ("DCM"), a Swap Execution Facility ("SEF"), and a Derivatives Clearing Organization ("DCO"). These licenses provide access to the U.S. commodities derivatives markets as a regulated exchange, and with its acquisition of LedgerX by way of S&C's assistance, FTX acquired that access in one fell swoop.

With the help of S&C, FTX was able to leverage these three licenses in subsequent applications to the CFTC and other regulators.

167.    In furtherance of the LedgerX deal, S&C advised FTX US on CFTC-regulatory issues, executive compensation, intellectual property matters, antitrust and Hart-Scott-Rodino clearance, and matters relating to the U.S. Department of Treasury's Committee on Foreign Investment in the United States ("CFIUS"). For these services, S&C collected approximately $1,513,000. S&C's primary client contact on the matter was Dan Friedberg.

168.    The LedgerX transaction was the first matter on which S&C represented FTX, and the team included Mitch Eitel (mentor to Ryne Miller) and many other attorneys from S&C. This transaction was designed to provide FTX US with a CFTC-regulated Designated Contract Market, Swap Execution Facility, and Derivatives Clearing Organization, which was meant to help FTX in "further developing a strong working relationship with the U.S. regulatory community." LedgerX (d/b/a FTX US Derivatives) promised to be one of the more valuable pieces of FTX US, in particular, its ability to engage in futures trading, and the advantages that such licenses and technology lent to LedgerX (d/b/a FTX US Derivatives) (and, by extension, FTX US) vis a vis its competitors were notable, and they would have added value to any investment in FTX US.

169.    Zach Dexter, a long time Miami resident who founded LedgerX and led it as a chief executive prior to the FTX acquisition and whom FTX installed as CEO of LedgerX once the transaction was finalized, touted the acquisition as one that would enhance both FTX's regulatory compliance and the safety of the FTX exchange. Mr. Dexter asserted that these were top priorities for the company in announcing the acquisition:

> As the regulatory environment in the crypto ecosystem continues to evolve, we look forward to acting as a resource and an example of how the protections afforded by proper regulatory oversight and licensing can boost consumer confidence and facilitate safe and reliable exchange platforms. The most important facet of this acquisition of LedgerX is that it allows us to do that. FTX US Derivatives will continue to strive to be a part of the regulation conversation and ensure that the operational standards required by the CFTC are maintained.

At other times, SBF explained that FTX pursued acquisitions like LedgerX, which were purportedly driven by regulatory and compliance considerations, because what matters most "is transparency and protection against fraud."

170.    Contrary to these representations, SBF later admitted to journalists that FTX's public commitment to regulatory compliance was "just PR," to which he added:

fuck regulators

they make everything worse

171.    These admissions highlight the FTX entities' true reasons for acquiring necessary licenses by way of acquisition like LedgerX. Rather than obtain these licenses through application to the licensing agencies, where the FTX entities would face "uncomfortable questions" and robust vetting from regulators, the FTX entities instead purchased other companies that already held the licenses they needed. This allowed the FTX entities to circumvent the scrutiny of regulators like the CFTC while fostering "the cleanest brand in crypto" and concealing the fraud that pervaded their organization. This strategy had the added benefit of providing SBF access to meetings and other avenues for lobbying the same regulators he privately denigrated, not to push for heightened customer protections or regulatory oversight, as he claimed publicly, but to lobby for more lenient regulations in the crypto space. In this manner, S&C helped to design the FTX entities' licensing by acquisition strategy in furtherance of SBF's fraud.

172.    Ryne Miller's connections to regulators were crucial to the pursuit of this deal. With Miller in place, and S&C at the helm, FTX enjoyed a direct throughline to CFTC Commissioner Rostin Behnam, whom Mr. Miller and SBF repeatedly emailed directly, conferenced over Zoom, and met privately over dinners to discuss "a LedgerX matter of considerable urgency," "a potential stablecoin regulatory framework," and the CFTC's "continued engagement" as FTX US proceeded with the LedgerX acquisition.

### ii.    The Voyager Asset Purchase and Other Pre-Petition Bankruptcy Matters

173.    S&C served as bankruptcy and M&A counsel to FTX US, as purchaser, and Alameda, as a prepetition creditor and counterparty, in FTX US's proposed acquisition through Chapter 11 proceedings of the assets of another cryptocurrency exchange, Voyager Digital Ltd. ("Voyager"), valued at $1 billion. The auction process was "highly competitive" and thorough, lasting "multiple rounds" over "two weeks." On September 26, 2022, just over a month before FTX's collapse, Voyager announced that FTX US had prevailed upon its competitors, offering the

"highest and best bid" of approximately $1.42 billion for the assets. The deal failed to close prior to FTX's collapse, and the transaction is no longer proceeding.

174.     S&C also assisted Alameda in filing a proof of claim in the *Voyager* bankruptcy and appeared in bankruptcy court on behalf of *both* FTX US and Alameda. S&C reaped fees and expenses totaling approximately $3,128,000 for its work on behalf of FTX and Alameda in the *Voyager* bankruptcy. For the matter, S&C's primary client contacts were Can Sun, Ramnik Arora, and Rahul Sharma.

175.     In other bankruptcy matters, S&C assisted Alameda and FTX US in their due diligence of potential transactional opportunities arising out of the Chapter 11 proceedings of Celsius Network LLC ("Celsius"), a cryptocurrency lending firm that filed for bankruptcy in July 2022, and billed $421,000 for this work. Notably, and what led to its collapse, Celsius was operating a fraud much like that of FTX. On July 13, 2023, Damian Williams, the United States Attorney for the Southern District of New York, unsealed an indictment charging Alexander Mashinsky, Celsius's founder and CEO, with fraud arising from "a series of false claims about the fundamental safety and security of the Celsius platform, and for participating in a scheme … to inflate the price of Celsius's proprietary token, CEL." Reportedly, FTX US considered acquiring Celsius or providing it with financing but upon review of the company's balance sheet, which revealed a $2 billion hole, FTX walked away from the deal. Alameda, however, apparently had no problem transacting in business with Celsius, as bankruptcy filings revealed that Alameda owed Celsius $12 million in outstanding loans. S&C and FTX apparently understood the implications of the $2 billion hole and avoided the risk exposure, even if Alameda lacked the scruples to decline to capitalize on the fraud.

### iii.   Counsel to Emergent, One of the FTX Group's Primary Laundering Vehicles

176.     Throughout its representations of the FTX Group and certain FTX Insiders, S&C served as primary counsel to Emergent, an Antiguan subsidiary of FTX that frequently served as a laundering vehicle critical to the FTX fraud.

177.     For example, on May 6, 2022, the following "round trip" transactions were issued through Emergent:

- First, $316 million and $35 million was sent from Alameda to SBF's and Gary Wang's personal ftx.com accounts, respectively, as "founder loans."

43

- Second, the same amount was transferred as "capital contribution[s]" from those personal accounts to emergent@placeholder.com, noting "that this Emergent account is just a placeholder – funds should never stay in there."

- Third, the same amount was transferred from emergent@placeholder.com back to Alameda Research Ltd. as a "stock purchase."

In FTX records, Friedberg explained, "it is just a round trip - from AR to Sam/Gary to Emergent back to AR Ltd." FTX records further show that such "round trip" transfers by way of Emergent were commonplace at FTX, as Friedberg previewed for employees executing the transactions that "we're going to have to do this a few times over the next few days."

178.    Emergent was the same entity through which SBF purchased shares of Robinhood, which were then pledged as collateral for $680 million in loans from BlockFi to Alameda, in a series of transactions for which S&C served as legal counsel to SBF in a personal capacity and was paid by Alameda, as further detailed herein.

#### iv.   LedgerX's CFTC Application

179.    The "most important regulatory application" for FTX US, and for which it again hired S&C for counsel, was FTX US's formal request to the CFTC to modify LedgerX's registration as a derivatives clearing organization to allow LedgerX to offer margined products directly to participants—that is, without an intermediary common to such transactions outside of the crypto space and necessary to protect customers. The CFTC described the highly unusual nature of FTX US's request, explaining that:

> With limited exceptions, derivatives trading today is conducted through regulated intermediaries who perform many important functions, including providing customers with access to exchanges and clearinghouses, processing transactions, ensuring compliance with federal regulations, and guaranteeing performance of the derivatives contract to the clearinghouse. Recently, however, a number of registered entities have discussed with CFTC staff proposals to offer "non-intermediated" or direct trading and clearing of margined products to retail customers.

180.    In considering FTX US's application, the CFTC held a public roundtable on May 25, 2022. S&C advised FTX US's lobbying of the CFTC throughout that process, including the preparation of SBF's May 12, 2022 testimony before the U.S. House Committee on Agriculture in support of the application, in which SBF highlighted FTX US's purported risk management controls, which FTX US offered as alleviating the need for consumer protections afforded by an

intermediary. Such controls included the $250 million FTX Guaranty Fund, the purpose of which was to protect depositors by absorbing losses by other users on the FTX Platform.

181.    While the $250 million FTX Guaranty Fund was touted by SBF and FTX Group to regulators as a fund comprised of $250 million worth of FTX Group assets, purportedly held in LedgerX's accounts, these funds were actually comprised, in whole or in part, of FTX customer funds, diverted by SBF or other Insiders by way of round-trip and other laundering transactions through Emergent, for which S&C reportedly served as "primary counsel."

182.    S&C's work on FTX US's CFTC application also included assistance in FTX US's drafting of a letter by Brian G. Mulherin, General Counsel of LedgerX and former attorney at the CFTC, submitted on February 8, 2022 and soliciting CFTC approval of LedgerX's application to offer margin trading directly to customers. In the letter, Mr. Mulherin noted that:

> Having operated a direct-access exchange and clearinghouse without intermediaries for several years now, FTX has already developed DCO operations that often exceed or are comparable to key [futures commission merchant ("FCM")] duties prescribed by CFTC Regulations, including: (a) maintenance of adequate financial resources; (b) safeguarding customer money, securities, and other property; and (c) implementing appropriate eligibility access criteria. Additionally, other clearing-related functions traditionally performed by FCMs, including know your customer ("KYC") and anti-money laundering ("AML") functions, are currently performed by FTX.

Mr. Mulherin, with S&C's assistance, thus represented to the CFTC and the investing public, that FTX was liquid and safe. Over the course of its several engagements for FTX, S&C saw that it was neither, as FTX lacked even the most fundamental internal controls and SBF was treating FTX as his personal piggybank. S&C counseled FTX to submit the letter anyway and collected fees and expenses totaling approximately $662,000 for this work.

183.    Thereafter, S&C advised FTX US in connection with information requests from the CFTC to LedgerX's recordkeeping obligations. At his criminal trial, SBF testified that FTX's recordkeeping was primarily routed through Signal, an encrypted messaging app, which FTX set to auto-delete messages sent and received among FTX employees. Many of those Signal chats included Zach Dexter, CEO of LedgerX. S&C collected fees and expenses for this matter totaling approximately $22,000.

184.    S&C advised FTX Trading in responding to information requests from the CFTC regarding the availability of FTX Trading's cryptocurrency exchange to persons in the United States and FTX Trading's Know Your Customer policies and procedures. Total fees and expenses

received for this matter were approximately $1,405,000. The primary client contacts were Dan Friedberg and Ryne Miller.

185.    S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding certain customer information relating to the May 2022 Terra/Luna cryptocurrency crash. At center of the Terra/Luna crash was Terraform Labs, which issued TerraUSD, purportedly a "stablecoin" with a value fixed to another asset. Typically, stablecoins are pegged to traditional fiat currency, like the US dollar. TerraUSD, however, was not pegged to fiat and instead was backed by another coin minted by Terraform Labs, Luna, whose supply Terraform Labs controlled.

186.    In early May 2022, a large sale of TerraUSD triggered a run on TerraUSD and Luna, causing the values of each to plummet, and wiping out $60 billion in the process. Prosecutors later investigated whether FTX manipulated the market for TerraUSD and Luna, causing the crash "to benefit the entities [SBF] controlled, including FTX and Alameda." S&C charged approximately $218,000 for assisting FTX in this matter.

187.    On at least two other occasions, S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding investigations into one or more third-party cryptocurrency exchanges. S&C received more than $150,000 in expenses and fees for these matters. S&C also advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding an investigation into a company behind a popular NFT and received approximately $68,000 in expenses and fees for the advice.

188.    S&C advised FTX US in connection with specific U.S. regulatory questions relating to staking, securities futures registration, beneficial ownership reporting, antitrust compliance, and other matters. From this and from its concurrent representation of FTX and Alameda in other matters, S&C learned of the overlapping ownership between Alameda and FTX Group, and that Alameda and FTX Group were operated as a common enterprise by SBF. S&C collected fees and expenses totaling approximately $113,000 for this work.

189.    In August 2022, S&C advised FTX US in connection with information requests from the United States House of Representatives Oversight and Reform Subcommittee on Economic and Consumer Policy regarding the risk of crypto-related scams and fraud on the FTX US exchange; its vetting policies to investigate, flag and remove potentially fraudulent digital assets and accounts; and detail on FTX's governing policies for buying and selling digital

46

currencies, cybersecurity protocols, consumer protections and plans to take more stringent action to combat financial scams. S&C collected fees and expenses totaling approximately $80,000 for this matter.

190.     S&C advised FTX Trading in connection with preparing a white paper concerning a new potential legislative approach for stronger customer protections upon digital asset insolvency in The Bahamas. Total fees and expenses received for this matter were approximately $49,000. FTX's marketing of its commitment to customer protections by way of this white paper and in other materials both was false and helped to generate the façade of safety necessary to perpetuation of the FTX fraud.

191.     S&C advised FTX US on several miscellaneous strategic inquiries, including transaction and bank regulatory matters. Total fees and expenses received for this matter were approximately $46,000.

192.     S&C advised FTX US in connection with the application of securities laws to a possible cryptocurrency staking program structure. Total fees and expenses received for this matter were approximately $16,000.

193.     S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding certain customer accounts and transactions relating to a third-party cryptocurrency exchange. Total fees and expenses received for this matter were approximately $7,000.

194.     S&C advised FTX Trading in responding to information requests from U.S. regulatory authorities regarding trading on the FTX US exchange, including potential Insider trading activity.

### v.   *Legal Services to FTX Insiders*

195.     S&C's involvement did not touch only upon the corporate affairs for FTX. S&C also represented key FTX Insiders in their personal capacities and in regard to their personal matters.

196.     For some time, ending in August 2022, Nishad Singh retained S&C for personal legal advice for U.S. tax matters and estate planning, which Mr. Sun, General Counsel to FTX Trading, arranged, which cost $22,000, and which was paid for by Alameda. Upon information and belief, this advice related to the sham loans that FTX routed through Mr. Singh.

197.     From April 2022 to August 2022, S&C represented SBF in his personal capacity relating to his position in the stock trading app company Robinhood Markets, Inc ("Robinhood"), during which time S&C was also advising Robinhood on a $2.275 billion credit facility. S&C billed $195,000 for the legal services provided to SBF on this matter, which fees Alameda paid.

198.     SBF's Robinhood stock purchase was substantial, amounting to over 56 million shares at a market value exceeding $545 million. This was, therefore, no simple transaction, and despite S&C's expertise and advice to SBF on the transaction, the purchase was not arranged through sophisticated financial institutions but rather over the course of 29 separate trading days over a period of two months via Emergent, the FTX entity set up in Antigua and Barbuda (a known haven for money laundering and financial fraud) in which SBF owned a majority share and through which Dan Friedberg directed that round-trip transfers and other laundering of customer deposits be routed. Notably, SBF's Robinhood shares were later pledged as collateral for $680 million in loans that Alameda owed to BlockFi, a third-party cryptocurrency lender.

199.     The nearly half billion dollars SBF put up for the Robinhood shares were comprised of customer funds. In a letter dated January 30, 2023, Damian Williams, the United States Attorney for the Southern District of New York, whose office prosecuted SBF for charges arising from the FTX fraud, explained to Judge Kaplan:

> In December [2022], the defendant moved to take control of approximately $500 million of Robinhood shares that were purchased using misappropriated FTX customer funds by a special purpose entity owned primarily by the defendant. The Government has since seized the shares after demonstrating probable cause to believe that they are the proceeds of wire fraud and are property involved in money laundering. Since the Government's seizure, the defendant has claimed that he would direct the majority of these funds toward making customers whole, but the original circumstances of the purchase of these shares, through a foreign special purpose vehicle with no public connection to FTX or Alameda, further indicate the steps the defendant has taken to obscure his criminal misuse of FTX customer property.

Upon information and belief, the "foreign special purpose vehicle with no public connection to FTX or Alameda" was Emergent, for whom S&C served as "primary counsel" and which served as one of the primary vehicles through which the FTX Group misappropriated customer funds.

200.     Based upon its past engagements with the FTX Group and Alameda, as well as its regulatory and legal expertise, S&C was familiar with the financial structure—including where FTX customer accounts were held—of the FTX Group, Alameda, Emergent (the special purpose

vehicle involved in the transaction), SBF, and even Robinhood, which S&C had represented in another matter.

201.    In particular, S&C represented at the same time both Emergent, the special purpose vehicle used to accomplish the share purchase (such that S&C knew how the shares were purchased and with what funds) and also SBF who purchased the Robinhood shares. As set forth above, DOJ stated these shares were purchased using misappropriated funds and result of wire fraud and money laundering, and S&C – as counsel for the FTX entities in multiple matters – was familiar with the flow of funds between Alameda and FTX and how the platform was regulated.

202.    SBF was ultimately convicted for money laundering for the Robinhood transaction. Count 7 of SBF's indictment was for money laundering and alleged that:

> It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, in an offense in and affecting interstate and foreign commerce, knowing that the property involved in a financial transaction, to wit, one or more monetary transfers, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud alleged in Count One of this Indictment, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(l)(B)(i).

203.    SBF's superseding indictment filed on August 14, 2023 specified that:

> As a result of committing the offense alleged in Counts Seven of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense, and the following specific property:

> [. . .]

> 55,273,469 shares of the stock of Robinhood Markets Inc. from Account Number 499-30500 at ED&F Man Capital Markets, Inc. a/k/a "Marex," held in the name of "Emergent Fidelity Technologies," seized by the Government on or about January 4, 2023.

204.    In November 2023, Sam Bankman-Fried was convicted by the jury on all counts, including Count 7 for money laundering to purchase the Robinhood shares through Emergent.

### vi.  Miscellaneous Other Matters

205.    S&C advised FTX US in connection with one intellectual property matter, a lawsuit filed by Jack in the Box alleging trademark dilution and copyright infringement of its Jack mascot in several of FTX's commercials which ran during Major League Baseball games. The Jack in the Box suit directly implicated FTX's advertising campaign, through which sports teams, such as Defendant Golden State Warriors, celebrities, such as Defendants Tom Brady and Gisele Bundchen, and other influencers, such as Defendant Kevin O'Leary, hawked FTX as a reliable and trustworthy crypto exchange. These advertisements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets, the advertisements were necessary to the rise of the FTX fraud, and FTX's explanation for using stars like Brady, Bundchen, and the other Defendants was no secret. "We're the newcomers to the scene," said then-FTX US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said. In defending the Jack in the Box lawsuit, S&C helped FTX's ad campaign continue and, S&C collected $50,000 in fees and expenses for its assistance on the matter.

206.    S&C opened a matter for FTX Ventures Ltd. in connection with the possible restructuring or workout of its investment in a potentially distressed public company. Total fees and expenses received for this matter were approximately $30,000.

### vii.  The FTX Group's Bankruptcy Petition and Administration

207.    As explained above, S&C, along with its man on the inside, Ryne Miller, pushed heavily for FTX to file for Chapter 11 bankruptcy over the course of a couple days in early November 2022. Mr. Miller, in asserting his control over FTX, urged an immediate wire of $4 million to S&C to retain it in advance of the Chapter 11 bankruptcy filings. The final hours before the bankruptcy featured significant upheaval as the attorneys sought to take control of the tumultuous situation at FTX – with Ryne Miller and Can Sun entering a video meeting with Mr.

Dietderich of S&C where they updated him on the disastrous state of FTX and that they did not have the money to pay back customers.

208.   Mr. Miller, who at that point was focused on FTX Trading, began to direct his ire on the FTX Insiders regarding FTX US. He sought assurances that the FTX US portion was solvent, but he did not receive proof from those in the Bahamas.

209.   On Friday, November 11, 2022, SBF unilaterally turned over control of the company to John Ray, who worked directly with S&C to initiate the FTX bankruptcy. Additional funds were secured for use in the bankruptcy matter from LedgerX – $200 million worth.

210.   The Antiguan International Business Corporations Act (IBCA), alongside FTX Trading's own Articles of Incorporation and By-Laws, sets forth the framework within which corporate decisions of this magnitude must be made. The Omnibus Corporate Authority appears to sidestep these procedural checks and balances that otherwise would have included a formal board resolution authorizing the filing of the bankruptcy petition.

### c.   S&C's Knowledge of & Assistance in FTX's Wrongdoing.

211.   Through the relevant period, 2021 through November 2022, S&C, as counsel to FTX Group and to SBF and Nishad Singh, personally, on numerous engagements and interactions, placed itself in a unique position to gain deep insight into the FTX entities' convoluted organizational structure, abject lack of internal controls, and dubious business practices.

212.   The provision of S&C's services involved (and industry standards required) due diligence and monitoring, including, for example: reviewing the organizational documents for the FTX entities, including certificates of incorporation or formation, by-laws, and other agreements and understanding the purpose of acquisitions (*e.g.*, LedgerX, and Voyager); reviewing customer contracts and reviewing finance documents, including intracompany loans or other related party agreements, guarantees and promissory notes, including but not limited to for the purposes of counseling on regulatory issues; and investigating FTX and Alameda business practices.

213.   For example, according to FTX Insiders, the LedgerX acquisition revealed key components of the fraud to Ryne Miller, Zach Dexter, and likely S&C, upon completion of a software audit of FTX in connection with the LedgerX acquisition that uncovered the "back door" that SBF directed Gary Wang to program into the FTX Group's computer systems and through which FTX funneled customer deposits to Alameda. LedgerX had access to view the code base where, in particular, it could see in the code the special privileges for Alameda, including the

51

privilege enabling a negative balance (the "allow negative" feature), meaning that Alameda was exempt from the auto-liquidation feature that other customers were held to, which would automatically liquidate accounts that went negative, allowing FTX insiders to divert unlimited amounts of customer funds out of FTX through Alameda's account.

214.    Mr. Miller and Mr. Dexter have disclaimed any knowledge of the "back door" programing feature until well into the bankruptcy process, opting instead to conceal the back door from FTX customers, unwitting victims of SBF's fraud.

215.    Moreover, as part of S&C's M&A work for the FTX Group, including its acquisition of LedgerX and its bid for Voyager's assets through bankruptcy, S&C drafted purchase agreements that contained representations and warranties as to FTX's corporate governance, good standing, compliance with laws, and sources of funds for the acquisitions. For example, as part of FTX's winning bid for assets in the *Voyager* bankruptcy, S&C included the following representations and warranties in the purchase agreement:

A.    Organization and Qualification. Purchaser [i.e., FTX] is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

B.    Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Payment, Acquired Cash Payment and the Cryptocurrency Consideration, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

C.    Absence of Restraints; Compliance with Laws; Permits. To the Knowledge of Purchaser, as of the date of this agreement, no facts or circumstances exist that would reasonably be expected to impair or materially delay the ability of Purchaser to consummate the transactions contemplated by this Agreement. Purchaser is not in violation of any Laws or Orders applicable to the conduct of its business, except

for violations the existence of which would not reasonably be expected to prevent, materially impair or materially delay the ability of Purchaser to consummate the Transactions. Purchaser holds and is in compliance with all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership or use of the Acquired Assets, except those the absence of which to have would not, individually or in the aggregate, reasonably be expected to be material to Purchaser's business.

216.    In drafting and confirming the accuracy of FTX US's representations and warranties in the *Voyager* and other purchase agreements, including for LedgerX, S&C learned, for example, that the FTX Group did not implement many of the most basic governance practices or internal controls; that the FTX Group did not have the "assets … to carry on its business as it is now being conducted" without the use of FTX customer funds; that the FTX Group did not hold necessary licenses, as it was operating FTX US and FTX Trading as unlicensed money service businesses selling unregistered securities; that the FTX Group had lent billions, including most of its cryptocurrency reserves, to Alameda, whose balance sheets in turn were propped up by the FTX-minted FTT token; and that FTX US's payment for Voyager's assets was comprised of customer funds.

217.    Notwithstanding this knowledge, S&C vouched for the solvency, safety, and security of the FTX Group up until its very collapse. During the *Voyager* auction, S&C assured the *Voyager* debtors that FTX could legally consummate the deal, writing that:

> [D]ifferent deals may have a different ability to "match" what the customers had. **FTX has a bottomless sea of ordinary cryptocurrency**, but not sure we can match every currency. On the other hand, the estate may not have enough cryptocurrency to match the basics without going out to buy it. Not sure how all that plays out or how material [the ability to match like for like the crypto found on the Voyager platform is to the deal].

218.    Moreover, S&C reviewed, if not advised on, FTX Group's customer terms of service, which FTX Group breached in furtherance of the fraud. For example, FTX US's bid for Voyager's assets would have involved migrating approximately 1 million customer accounts to FTX US." Upon information and belief, the FTX Trading and FTX US customer terms of service, which would govern the Voyager customers' accounts once migrated to FTX, were offered by the FTX Group and reviewed as part of the auction process. As lead counsel to FTX US in its bid for the Voyager assets and, upon information and belief, reviewing the FTX Group terms of service in connection with that bid, S&C had knowledge that FTX US and FTX Trading promised to segregate and hold customer funds for the customer's benefit (e.g., as fiduciary and custodian).

219.   In the FTX US terms of service, FTX US represented to customers that:

i.   "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX[] US for your benefit";

ii.   "[t]itle to cryptocurrency represented in your FTX[] US Account shall at all times remain with you and shall not transfer to FTX[] US"; and

iii.   that "FTX[] US does not represent or treat assets in your FTX[] US Account as belonging to FTX[] US."

Similarly, the FTX Trading Ltd. Terms of service provide:

i.   "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading";

ii.   "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading"; and

iii.   "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

220.   In advising or reviewing these terms and in offering the terms to Voyager in bidding for its assets, S&C learned that the FTX entities were breaching these terms, and in turn, their fiduciary duties to customers, acting inconsistently with their representations to customers, and misappropriating customer funds. Not only did S&C provide legal assistance despite this knowledge, but it aided transactions through which misappropriated customer funds were diverted, including FTX's "round trip" transfers and SBF's purchase of Robinhood shares through Emergent.

221.   Additionally, through their work and diligence, S&C was necessarily aware of the representations FTX US and FTX Trading Ltd. made to their customers and/or regulators and, upon information and belief, knew that such representations were untrue. On several occasions, S&C concurrently represented FTX Group entities in transactions between other FTX Group entities and was, as a result, on both sides of deals involving FTX entities. From these concurrent representations, S&C was well positioned to uncover through its due diligence the incestuous relationship between and among the FTX Group entities and the FTX Insiders, including the overlapping ownership of Alameda and FTX. To be sure, S&C memorialized in a *Voyager* bankruptcy filing on behalf of Alameda that it knew Alameda was trading on behalf of private owners, including on the FTX exchange and recognized that Alameda would be a major beneficiary of FTX Group's purchase of Voyager's assets, representing that:

54

Alameda trades in digital assets for its own account on behalf of private owners. Based on the information disclosed by the Debtors, Alameda is the largest stockholder and largest creditor of the Debtors. Alameda Ventures Ltd. is the only identified creditor of debtor Voyager Digital Holdings, Inc. ('Voyager Holdings'), the holding company that owns 100% of debtor Voyager Digital, LLC ('Voyager Digital'), the Debtors' primary operating company.

222.    Specifically, on November 17, 2022, Mr. Ray declared, in a declaration in support of Chapter 11 petitions, that:

Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

223.    Before that, on November 9, 2022, Changpeng Zhao ("CZ"), CEO of Binance, the world's largest cryptocurrency exchange and whom SBF solicited for a bailout just prior to FTX's collapse, uncovered these deficiencies *after only 24 hours* of basic diligence, noting that FTX had "[w]ay too many issues" to consummate any deal. The speed with which CZ was able to identify FTX's misconduct demonstrates that any party with even the most cursory visibility into the FTX Group's operations could see the FTX Group's misconduct, S&C included. To be sure, S&C saw what CZ saw, because, upon information and belief, it led the FTX Group in the negotiations for Binance's bailout of FTX, as suggested by S&C's supplemental bankruptcy disclosures:

In addition to the foregoing matters, on November 7, 2022, S&C also opened a matter for FTX Trading Ltd. for strategic matters relating to potential capital raises, sales, out-of-court restructuring matters or similar transactions arising out of liquidity concerns following press reports of a large liquidation of FTT.

224.    But S&C had already profited millions from its pre-petition work for the FTX Group, work that helped perpetuate the FTX fraud and, though by this time FTX customers had lost more than $8 billion in the fraud, S&C realized it stood to gain hundreds of millions more from their work in bankruptcy.

## IV.    CLASS ACTION ALLEGATIONS

225.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.    Class Definitions

226. Plaintiffs Vozza, Rupprecht, Winter, and Kavuri seek to represent the following International Classes and Plaintiffs Orr, Cabo, Henderson, Livieratos, Chernyavsky, Podalsky, Shetty, Ezeokoli, Norris, Garrison, Huang, and Papadakis seek to represent the following Classes:

**(1)** __International Class__ All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

**(2)** __Nationwide Class:__ All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform, purchased or enrolled in a YBA, or purchased FTT.

Excluded from the Classes are the MDL Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

227. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes or to include additional classes or subclasses before or after the Court determines whether such certification is appropriate as discovery progresses.

**B.      Numerosity**

228. The Classes are comprised of thousands, if not millions, of consumers globally to whom FTX offered and/or sold cryptocurrency, the Deceptive FTX Platform, YBAs, and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

**C.      Commonality/Predominance**

229. This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

56

(a) whether FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities committed fraud, negligence, and/or breached fiduciary duties;

(b) whether the Defendant agreed with FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities to deceive FTX customers and/or commit fraud;

(c) whether the Defendant had the requisite degree of knowledge of FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities' fraud and/or negligent acts;

(d) whether Defendant aided in the FTX Group entities' substantial interference with Plaintiffs' and Class Members' property in a manner inconsistent with their property rights by misappropriating or comingling those funds;

(e) the type and measure of damages suffered by Plaintiffs and the Class.

(f) whether Plaintiffs and Class Members have sustained monetary loss and the proper measure of that loss;

(g) whether Plaintiffs and Class Members are entitled to injunctive relief;

(h) whether Plaintiffs and Class Members are entitled to declaratory relief; and

(i) whether Plaintiffs and Class Members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendant's conduct.

**D.    Typicality**

230.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold FTX's Deceptive FTX Platform, that MDL Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX insiders, and/or FTX, or that Defendant agreed with Bankman-Fried, the FTX insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to Defendant that are unique to Plaintiffs.

**E.    Adequacy of Representation**

231.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic

interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.    Requirements of Fed. R. Civ. P. 23(b)(3)**

232.    The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendant (1) in marketing, offering, and/or selling the Deceptive FTX Platform, YBAs, and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, (3) in aiding and abetting fraud, breach of fiduciary duty and/or conversion by Bankman-Fried, FTX and the FTX insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

233.    The common course of conduct by MDL Defendants includes but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the Deceptive FTX Platform, YBAs, and/or FTT, and/or their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

234.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

235.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes, as is in the case at bar, common questions will be held to predominate over individual questions.

**G.    Superiority**

236.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class Members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class Members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As

a result, individual Class Members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class Members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum;

(e) Individual suits would not be cost-effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.      Requirements of Fed. R. Civ. P. 23(b)(2)**

237.     The MDL Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the misappropriation of Class Member deposits, as well as aiding and abetting the offering and/or selling of the Deceptive FTX Platform, YBAs, and/or FTT, which are unregistered securities, on the basis of material misstatements and/or omissions, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.      Requirements of Fed. R. Civ. P. 23(c)(4)**

238.     As it is clear that one of the predominant issues regarding MDL Defendants' liability is whether the Deceptive FTX Platform, YBAs, and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class-wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

239.     Another predominant issue regarding MDL Defendants' liability is whether they have violated the consumer protection and securities laws of Florida, California, and other jurisdictions in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class-wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.      Nature of Notice to the Proposed Class.**

240.     The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and

objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## V.    CAUSES OF ACTION

### COUNT 1
### Civil Conspiracy

241.    Plaintiffs hereby incorporate the allegations in all preceding paragraphs as if fully set forth herein.

242.    There was an express or implied agreement between, on the one hand, FTX US, FTX Trading Ltd., Alameda, and/or other agents of FTX Group entities and, on the other hand, S&C, to deceive Class Members, and to commit the wrongful conduct described herein, namely FTX Group's fraud and conversion of Class Members' property.

243.    Through the course of its due diligence, long and close relationship with, and representation of FTX US, FTX Trading Ltd., and/or Alameda as well as employees or executives of the foregoing, S&C knew of FTX US and FTX Trading Ltd.'s omissions, untruthful and fraudulent conduct, and misappropriation of Class Members' funds. Despite this knowledge, S&C stood to gain financially from the FTX Group's misconduct and so agreed, at least impliedly, to assist that unlawful conduct for its own gain.

244.    For example, as further explained above, S&C gleaned detailed knowledge about the operations and financials of FTX through its representation for matters involving acquisitions, such as LedgerX, a purchase designed to obfuscate the true nature of FTX's business, and regulatory advisement, such as for matters involving the CFTC.

245.    Further, S&C gained detailed knowledge about the financials of SBF himself through, as further alleged above, their representation of him in his personal capacity for a complicated stock purchase related to Robinhood.

246.    S&C agreed with its co-conspirator(s) to commit the overt acts alleged herein, each in furtherance of fraud and conversion of Class Members' property, including (1) structuring acquisitions and other transactions by which FTX US expanded its product offerings—and by extension, its reach to victims—and through which FTX US dodged regulatory scrutiny to obtain necessary licenses to operate in desired markets; and (2) generating for the FTX entities the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration.

247.    These acts were made in concert and pursuant to an agreement between S&C and its co-conspirator(s).

248.    But for the overt acts taken by S&C and its co-conspirator(s), the conspiracy would not have been able to carry out the FTX fraud to commingle and/or misappropriate customer funds. Plaintiffs and Class Members have suffered particularized harms from the foregoing conspiracy to commit fraud and conversion.

249.    As a result of this civil conspiracy, Plaintiffs and the Class suffered damages, including the loss of their ability to retrieve their fiat currency or digital assets as a result of the insolvency of FTX US and FTX Trading Ltd. Thus, S&C's actions in combination with the actions of Mr. Friedberg, SBF, and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, S&C is jointly and severally liable for these damages.

<u>**COUNT 2**</u>
**Common Law Aiding and Abetting Fraud**

250.    Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

251.    FTX US and FTX Trading Ltd. assured customers that they were holding their deposits in their accounts for the customers' benefit and that they would not convert their funds improperly.

252.    For example, FTX US represented to customers (i) that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX[] US for your benefit"; (ii) that "[t]itle to cryptocurrency represented in your FTX[] US Account shall at all times remain with you and shall not transfer to FTX[] US"; and (iii) that "FTX[] US does not represent or treat assets in your FTX[] US Account as belonging to FTX[] US."

253.    Similarly, FTX Trading Ltd. represented to its customers that, with respect to assets in their account, (i) "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading"; (ii) "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading"; and (iii) "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

254.    FTX Trading Ltd. and FTX US intended that customers rely on these representations and, indeed, gave customers assurances that their assets were safe, which was critical in inducing customers to trust the entities with their assets. The customers of FTX Trading Ltd. and FTX US relied on these representations in entrusting their assets with those entities. It

was reasonable for the customers to rely on these representations as, from all appearances, FTX Trading Ltd. and FTX US were responsible corporate entities whose principals had sought the counsel of large, sophisticated law firms like S&C for operational and compliance-related counsel.

255.    At the time FTX Trading Ltd. and FTX US made these representations, they knew the representations were false. Specifically, at the time of these representations:

   a)  FTX Trading Ltd. and FTX US were not holding Class Member funds strictly for their benefit, instead commingling those funds in FTX Group's omnibus accounts and treating those funds as FTX Group's own;

   b)  SBF was siphoning and otherwise misappropriating Class Member funds to his friends and family members or for his own personal use;

   c)  FTX US and Alameda were not, in fact, "wholly separate entit[ies]" operating at "arm's length," and were instead operated as a common enterprise;

   d)  Mr. Friedberg directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

   e)  SBF routinely transferred Class Member funds out of accounts held by the FTX entities to those held by Alameda under the guise of "related party transactions" and "loans";

   f)  SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

   g)  With the foregoing exemption, Alameda engaged in margin trading on the FTX trading platforms, exposing Class Members to the risks of Alameda's losses;

   h)  FTX Group used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

   i)  The FTX entities did not have in place fundamental internal controls, including an independent board of director or a CFO.

256.    The customers' reliance on FTX US and FTX Trading Ltd.'s representations was a substantial factor in causing their harm. Specifically, based on the assurances from those entities, customers allowed those entities to hold their assets. Had they known the truth, they would have never entrusted the entities with their assets.

257.    S&C knew of and aided and abetted the fraud of FTX Trading Ltd. and FTX US.

258.    Through its representation of the FTX entities, S&C acquired knowledge of FTX Trading Ltd. and FTX US's misrepresentations and omissions to customers, untruthful conduct, and misappropriation of Class Members' funds. Despite this knowledge, S&C stood to gain financially from FTX Group's misconduct and substantially assisted and encouraged the FTX Group's misconduct.

259.     For example, as further alleged above, S&C gained knowledge of the misrepresentations and omissions to customers through its representation of the FTX entities and founders, including via actions such as the acquisition of LedgerX, a purchase designed to obfuscate the true nature of FTX's business, and regulatory matters involving the CFTC, such as related to the Know Your Customer policy, and through FTX's bid for assets in the *Voyager* bankruptcy.

260.     Further, S&C gained detailed knowledge about the financials of SBF himself through, as further alleged above, their representation of him in his personal capacity for a complicated stock purchase related to Robinhood, including through its concurrent representation of the special purpose vehicle designed to execute the transaction, Emergent.

261.     As alleged above, in a letter dated January 30, 2023, the United States Attorney for the Southern District of New York explained that in December 2022, SBF moved to take control of approximately $500 million of Robinhood shares that were purchased using misappropriated FTX customer funds by a special purpose entity owned primarily by SBF. The Government has since seized the shares which were the subject of S&C's representation, after demonstrating probable cause to believe that the shares were the proceeds of wire fraud and property involved in money laundering.

262.     S&C substantially assisted and encouraged FTX Trading Ltd. and FTX US's fraud, including by (1) structuring acquisitions and other transactions by which FTX US expanded its product offerings—and, by extension, its reach to victims—and through which FTX US dodged regulatory scrutiny to obtain necessary licenses to operate in desired markets; and (2) generating for the FTX entities the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration.

263.     S&C knew that FTX Trading Ltd. and FTX US had omitted certain material facts, including, inter alia, regarding the above transactions involving LedgerX and the safety and viability of their entities to induce confidence in their platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of SBF and his co-conspirators' stakes in FTX. These omissions were material, as a reasonable consumer would have considered them in making decisions to engage in any transactions with FTX. In fact, Class Members reasonably relied on one or more of these representations as a substantial factor

influencing their decision to do business with FTX, including by accepting these statements without an independent inquiry into their veracity.

264. Notwithstanding S&C's knowledge, and by reason of the conduct described above, S&C substantially assisted and encouraged FTX Trading Ltd. and FTX US in a fraudulent scheme against Class Members, including by the actions set forth above, which were committed within the scope of S&C's employment and in furtherance of the firm's business.

265. Thus, S&C's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they could not retrieve their fiat currency or digital assets. S&C is thus jointly and severally liable for aiding and abetting this fraudulent scheme.

## **COUNT 3**
**Common Law Aiding and Abetting Fiduciary Breach, FTX US**

266. Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

267. FTX US took custody of the Class Member funds. As alleged herein, FTX US represented to customers that (i) "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX[] US for your benefit"; (ii) "[t]itle to cryptocurrency represented in your FTX[] US Account shall at all times remain with you and shall not transfer to FTX[] US"; and (iii) "FTX[] US does not represent or treat assets in your FTX[] US Account as belonging to FTX[] US."

268. As a custodian of Class Member funds, and by virtue of the representations FTX US made to customers, FTX US owed fiduciary duties to Class Members, including duties of care and loyalty, and were obligated to discharge those duties in good faith, with the care that a fiduciary in a similar position would exercise, and in a manner reasonably believed to be in the best financial interests of Class Members. Given FTX US's representations to its customers, FTX US acted akin to a trustee with respect to its customers.

269. Rather than safeguarding Plaintiffs and Class Member funds, FTX US misappropriated their funds in breach of the fiduciary duty owed to Plaintiffs and Class Members and otherwise failed to safeguard their assets. These breaches include, but are not limited to:

  a) Participating in and enabling a fraudulent scheme to commingle customer and corporate funds, including through the North Dimension entities;

b) Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and/or did not intend to repay;

c) Abusing or allowing abuse of positions by FTX US officers and Bankman-Fried for their gain and to the detriment of the FTX US;

d) Failing to implement or cause to be implemented corporate controls that would have prevented the wrongdoing alleged herein;

e) Failing to investigate credible allegations of fraudulent and illegal conduct brought to its attention and to remediate any issues identified by such investigation.

270. Based on S&C's knowledge of the applicable regulatory and legal framework, financial industry, focus on serving crypto clients, and its representation of FTX Trading Ltd., S&C acquired knowledge of FTX US's fiduciary duties to Class Members and breaches thereof.

271. Notwithstanding S&C's knowledge, S&C substantially assisted and encouraged FTX US's breach of fiduciary duties, including by, among other things, structuring acquisitions, including that of LedgerX, and by assisting with FTX's efforts to deceive regulators.

272. For example, as further alleged above, S&C gained knowledge of the misrepresentations and omissions to customers through its representation of the FTX entities and founders, including via actions such as the acquisition of LedgerX, a purchase designed to obfuscate the true nature of FTX's business, and regulatory matters involving the CFTC, such as those related to the Know Your Customer policy.

273. Further, S&C gained detailed knowledge about the financials of Mr. Bankman-Fried himself through, as further alleged above, their representation of him in his personal capacity for a complicated stock purchase related to Robinhood.

274. S&C's actions were committed within the scope of the S&C's employment with FTX and in furtherance of the firm's business.

275. Thus, S&C's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they could not retrieve their fiat currency or digital assets. S&C is thus jointly and severally liable for aiding and abetting this breach of fiduciary duties.

## COUNT 4
**Common Law Aiding and Abetting Fiduciary Breach, FTX Trading Ltd.**

276.     Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

277.     FTX US took custody of the Class Member funds. As alleged herein, FTX US represented to customers that (i) "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX[] US for your benefit"; (ii) "[t]itle to cryptocurrency represented in your FTX[] US Account shall at all times remain with you and shall not transfer to FTX[] US"; and (iii) "FTX[] US does not represent or treat assets in your FTX[] US Account as belonging to FTX[] US."

278.     As a custodian of Class Member funds, and by virtue of the representations FTX Trading Ltd. made to customers, FTX Trading Ltd. owed fiduciary duties to Class Members, including duties of care and loyalty, and was obligated to discharge those duties in good faith, with the care that a fiduciary in a similar position would exercise, and in a manner reasonably believed to be in the best financial interests of Class Members. Given FTX Trading Ltd.'s representations to its customers, FTX Trading Ltd. acted akin to a trustee with respect to its customers.

279.     Rather than safeguarding Plaintiffs and Class Member funds, FTX Trading Ltd. misappropriated their funds in breach of the fiduciary duty owed to Plaintiffs and Class Members and otherwise failed to safeguard their assets. These breaches include, but are not limited to:

    a) Participating in and enabling a fraudulent scheme to commingle customer and corporate funds, including through the North Dimension entities;

    b) Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and/or did not intend to repay;

    c) Abusing or allowing abuse of positions by FTX Trading Ltd. officers and Bankman-Fried for their personal gain and to the detriment of FTX Trading Ltd.;

    d) Failing to implement or cause to be implemented corporate controls that would have prevented the wrongdoing alleged herein;

    e) Actively contributing to a lack of corporate controls that would have prevented the wrongdoing alleged herein; and

    f) Failing to investigate credible allegations of fraudulent and illegal conduct brought to its attention and to remediate any issues identified by such investigation.

280.     Based on S&C's knowledge of the applicable regulatory and legal framework, financial industry, focus on serving crypto clients, and its representation of FTX Trading Ltd., S&C acquired knowledge of FTX Trading Ltd.'s fiduciary duties to Class Members and breaches thereof.

281.     For example, as further alleged above, S&C gained knowledge of the misrepresentations and omissions to customers through its representation of the FTX entities and founders, including via actions such as the acquisition of LedgerX, a purchase designed to obfuscate the true nature of FTX's business, and regulatory matters involving the CFTC, such as those related to the Know Your Customer policy.

282.     Further, S&C gained detailed knowledge about the financials of Mr. Bankman-Fried himself through, as further alleged above, their representation of him in his personal capacity for a complicated stock purchase related to Robinhood.

283.     Notwithstanding S&C's knowledge, S&C substantially assisted and encouraged FTX Trading Ltd.'s breach of fiduciary duties, including by, among other things, structuring acquisitions, including that of LedgerX, and by assisting with FTX's efforts to deceive regulators.

284.     S&C's actions were committed within the scope of the S&C's employment with FTX and in furtherance of the firm's business.

285.     Thus, S&C's actions were a substantial factor in causing actual damages to Plaintiffs and the Class members, including because they could not retrieve their fiat currency or digital assets. S&C is thus jointly and severally liable for aiding and abetting this breach of fiduciary duties.

## COUNT 5
## Federal R.I.C.O., 18 U.S.C. § 1962(d)

286.     Plaintiffs hereby incorporate the allegations in all paragraphs preceding Count 1 as if fully set forth herein.

287.     At all relevant times, and as described below, S&C agreed and conspired with Bankman-Fried, Friedberg, FTX Group entities, and others to violate 18 U.S.C. § 1962(c)

288.     Bankman-Fried directed and controlled a RICO enterprise through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities and other aspects of illegal activity alleged below to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

67

289.    The RICO enterprise, the activities of which affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included Bankman-Fried, Ellison, Friedberg, the FTX Group, and other unnamed co-conspirators. Their association was structured by contracts and agreements between and among them.

290.    The RICO enterprise shared a common purpose, which was to (i) convince and assuage potential and existing customers to entrust FTX US and FTX Trading Ltd. with their assets, (ii) conceal their misappropriate of customers' funds and conflict-of-interest activities, and (iii) make their ill-gotten gains available for the co-conspirators personal use in interstate and foreign commerce.

291.    The RICO enterprise had a continuity of structure and personnel and operated as an ascertainable, separate structure. Bankman-Fried was at all times the leader, assisted by Ellison, Wang, Singh, and Friedberg, who reported to Bankman-Fried as co-owners and/or as part of his inner circle. S&C attorneys served as the primary legal services providers for the RICO enterprise, assisting in the structuring of the enterprise operations.

292.    Together, these co-conspirators agreed to and did conduct and participate in the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding depositors and customers of FTX US and FTX Trading Ltd. Specifically, they committed multiple related acts of racketeering activity as follows:

a) Bankman-Fried committed multiple acts of wire fraud under 18 U.S.C. § 1343. Specifically, Bankman-Fried devised and perpetrated a scheme to defraud customers and potential customers of FTX cryptocurrency exchanges for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises and transmitted or caused to be transmitted by means of wire, radio, or television communication in intrastate or foreign commerce various writings, signals, pictures, and sounds for the purpose of executing their scheme;

b) Bankman-Fried committed multiple violations of 18 U.S.C. § 1952, prohibiting intrastate state or foreign travel in aid of racketeering enterprise. Specifically, Bankman-Fried traveled in interstate or foreign commerce with the intent to distribute the proceeds of his unlawful activity and otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishing, and carrying out of his unlawful acidity. This unlawful activity for purposes of this violation includes money laundering in violation of 18 U.S.C. § 1956 and indictable violations of the U.S. Code, Chapter 31, Subchapter II, prohibiting false reporting of monetary transactions.

c) Bankman-Fried committed numerous acts of money laundering in violation of 18 U.S.C. § 1956. Specifically, Bankman-Fried, with the knowledge that the property

involved in financial transactions as to which he and/or the FTX entities were parties represented proceeds of unlawful activity, did, in fact, conduct and attempt to conduct financial transactions that involved the proceeds of that unlawful activity and were intended to promote the carrying on of that unlawful activity.

d) Bankman-Fried engaged in numerous transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957. Specifically, Bankman-Fried repeatedly deposited funds derived from their unlawful RICO enterprise by and through financial institutions in the United States and abroad and thereby affected interstate and foreign commerce.

e) Bankman-Fried and Ellison operated an unlicensed money-transmitting business in violation of 18 U.S.C. § 1960. Specifically, Bankman-Fried, Ellison, and Friedberg operated Alameda as a money-transmitting business by directing wire transfers to that entity and proceeding to distribute those funds at their discretion. Alameda is not a licensed money-transmitting business in any jurisdiction, and its activities involved the transportation of funds that were intended to be used to promote or support unlawful activity.

f) Bankman-Fried and Ellison engaged in access device fraud in violation of 18 U.S.C. § 1029(a). Specifically, Bankman-Fried and Ellison knowingly and with intent to defraud trafficked in and/or use one or more unauthorized access devices during any one-year period and, by such conduct, obtained anything of value during the period.

293.    As a part of and in furtherance of the above violations and coordinated scheme to defraud, Bankman-Fried, FTX US, and FTX Trading Ltd. made numerous material omissions to the Plaintiffs and Class Members with the intent to defraud and deceive the Plaintiffs and Class members, as alleged above.

294.    Additionally, Bankman-Fried used and invested the income received through the pattern of racketeering activity to operate the RICO enterprise the FTX Group operations, and to enrich himself and his friends, which caused the Plaintiffs and Class Members to suffer damages. This income further allowed Bankman-Fried and his inner circle to perpetuate the operation of the enterprise and to continue to defraud the Plaintiffs and the Class members.

295.    These related criminal acts had the same or similar purpose, results, participants, victims, and methods of commission and are otherwise related, which are not isolated events, such that they constituted a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

296.    For its part, S&C facilitated the scheme to defraud and RICO enterprise by agreeing to provide and providing legal services to FTX US and FTX Trading Ltd., including through advice and counsel to Friedberg and Miller, and officers of the FTX entities. S&C did so knowingly, recklessly, or with willful blindness to the nature of the RICO enterprise but within the scope of

the S&C's employment and in furtherance of the firm's business. In fact, in exchange for S&C's counsel in these matters, FTX paid S&C significant fees.

297.    S&C had the specific intent to participate in the overall RICO enterprise, which is evidenced by its words and conduct in providing substantial assistance in facilitating the misappropriation of customer funds and the concealment of that misappropriation. Further, S&C reasonably calculated this assistance to shield the comingling and misappropriation of customer funds and to generally obfuscate the scheme to defraud Plaintiffs and members of the Class.

298.    S&C agreed, at least impliedly, with Miller and/or one or more of his co-conspirators to commit overt acts in furtherance of these activities, including (1) structuring acquisitions and other transactions by which FTX US expanded its product offerings—and, by extension, its reach to victims—and through which FTX US dodged regulatory scrutiny to obtain necessary licenses to operate in desired markets; and (2) generating for the FTX entities the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration.

299.    Notwithstanding S&C's knowledge, and by reason of the conduct described above, S&C participated with the FTX Group entities, Friedberg and Bankman-Fried, in a fraudulent scheme against Class Members, including by the actions set forth above, which were committed within the scope of the S&C's employment with FTX and in furtherance of the firm's business.

300.    In this manner, the S&C formed an illegal agreement to violate the substantive provisions of the RICO statute set forth above and thus are jointly and severally liable for the acts of their co-conspirators, including Bankman-Fried and Friedberg.

301.    By reason, and as a result thereof, S&C's conduct and participation in the racketeering activity described herein has caused Plaintiffs and the Class Members to incur significant damages directly.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.      Certifying the Class as requested herein;

b.      Awarding actual, direct, and compensatory damages;

c.      Awarding restitution and disgorgement of revenues;

d.      Awarding declaratory relief as permitted by law or equity, including declaring the Defendant's practices as set forth herein to be unlawful;

e.      Awarding injunctive relief as permitted by law or equity, including enjoining the Defendant from continuing those unlawful practices as set forth herein, and directing the Defendant to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.      Awarding statutory and multiple damages, as appropriate;

g.      Awarding attorneys' fees and costs; and

h.      Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Respectfully submitted this 16th day of February, 2024.

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
service@moskowitz-law.com

Kerry J. Miller
(*pro hac vice forthcoming*)
Molly L. Wells
(*pro hac vice forthcoming*)
C. Hogan Paschal
(*pro hac vice forthcoming*)
**FISHMAN HAYGOOD L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
(504) 586-5252; (504) 586-5250 fax
kmiller@fishmanhaygood.com
mwells@fishmanhaygood.com
hpaschal@fishmanhaygood.com

José M. Ferrer
Florida Bar No. 173746
Desiree Fernandez
Florida Bar No. 119518
**MARK MIGDAL & HAYDEN**
Brickell City Tower
80 SW 8th Street, Suite 1999
Miami, FL 33130
jose@markmigdal.com
desiree@markmigdal.com
eservice@markmigdal.com

***Co-Counsel for Plaintiffs and the Class***